## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **KIMBERLY REYNOLDS,** | ) | |
| **PARENT AND NEXT BEST** | ) | |
| **FRIEND OF JR, A MINOR** | ) | 1:19-cv-426-LG-RHW |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **GEORGE COUNTY SCHOOL** | ) | |
| **DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

**COMES NOW** Plaintiff, and files the following complaint pursuant to the

*Federal Rules of Civil Procedure*:

## PARTIES AND JURISDICTION

1. The Student, JR, whose date of birth is March 10, 2006, is a minor aged 13, whose

   name is identified only by his initials as "JR" pursuant to FRCP 5.2(a)(3).  JR is a

   citizen of and resides in George County, Mississippi. He is a student in the <u>George

   County School District</u>.  JR has severe autism.

2. At all material times JR has been legally entitled to receive special education and

   related services under the Individuals with Disabilities Education Act, 20 U.S.C.

   §§1400 et seq. ("IDEA") under the Mississippi Department of Education Office of

   Special Education "<u>Procedures For State Board Policy 74.19</u>."

3. The Individuals with Disabilities Education Act (IDEA) offers States federal funds to assist in educating children with disabilities. The Act conditions that funding on compliance with certain statutory requirements, including the requirement that States provide every eligible child a "free appropriate public education," or FAPE, by means of a uniquely tailored "individualized education program," or IEP. 20 U.S.C. §§ 1401(9)(D), 1412(a)(1).

4. The plaintiff  Kimberly Reynolds is JR's natural mother.  She is a citizen of and resides in George County, Mississippi.

5. The defendant George County School District (GCSD or "the district" or the "LEA") is a "Local Education Agency" ("LEA") as that term is defined by 20 USC §1401(19) and 34 CFR §300.28, and it is a public agency of the State of Mississippi with its principal place of business located in George County, Mississippi.  The district is a public school system in the State of Mississippi and an arm of the Mississippi Department of Education and receives federal funding. As such, it is responsible for ensuring compliance with all mandates arising under the numerous federal statutes for providing special education to the school age students residing within its district.

6. This court has jurisdiction pursuant to 28 U.S.C. Section 1331 federal question jurisdiction, and pursuant to the IDEA, 20 U.S.C. § 1415(i)(2)(C).  The district court may order declaratory and injunctive relief pursuant to 28 U.S.C. §§2201

and 2202. The district court has supplemental jurisdiction to adjudicate any state claims, which may arise out of the same facts as the federal claims pursuant to 28 U.S.C. §1367.

7. Personal jurisdiction exists over the defendant GCSD because it is citizen or arm of the government of the State of Mississippi.

8. Venue is proper pursuant to 28 U.S.C. §1391 as all the events giving rise to the claims herein occurred in this district.

<u>COUNT ONE - 20 U.S.C. § 1415(i)(2)(C)</u>
<u>INDEPENDENT REVIEW OF ADMINISTRATIVE DECISION</u>

9. The Individuals with Disabilities Education Act (IDEA) offers States federal funds to assist in educating children with disabilities. The Act conditions that funding on compliance with certain statutory requirements, including the requirement that States provide every eligible child ***a "free appropriate public education," or FAPE, by means of a uniquely tailored "individualized education program," or IEP.*** 20 U.S.C. §§ 1401(9)(D), 1412(a)(1)(emphasis added).

10. First, the Student, JR, initiates this action in the district court as an appeal and request for independent review of an administrative decision partially in favor of the <u>George County School District</u> on the issue of whether the district had denied JR a "free appropriate public education" or FAPE as required by the IDEA, during

the two years preceding the complaint for due process, the school years 2016-2017
and 2016-2018.

11. Second, because JR prevailed below in securing an administrative order that the
school provide FAPE after denying him even a pretext of FAPE during the school
year 2018-2019, the undersigned counsel request an award of attorney's fees
pursuant to 1415(i)(3)(B) of the IDEA, not only for attaining prevailing party
status for the student in the proceeding below, but also in the event counsel attains
prevailing party status for the student in this proceeding.

<u>THE DISTRICT COURT'S "VIRTUALLY *DE NOVO*"</u>
<u>STANDARD OF REVIEW</u>

12. The IDEA provides that a federal court reviewing a state hearing officer's decision
"(i) shall receive the records of the administrative proceedings; (ii) shall hear
additional evidence at the request of a party; and (iii) basing its decision on the
preponderance of the evidence, shall grant such relief as the court determines is
appropriate." 20 U.S.C. § 1415(i)(2)(C).

13. The district court's power of review of the hearing officer's decision is "***virtually
de novo***," as noted in *Houston Independent School v. VP Ex Rel. Juan P.*, 582 F.
3d 576, 583 (5th Cir. 2009):

> "When a district court reviews a hearing officer's decision under the IDEA
> program, it receives the records of the administrative proceedings and also
> takes additional evidence at the request of any party. Although the district
> court must accord `due weight' to the hearing officer's findings, the court

must ultimately reach an ***independent decision*** based on a ***preponderance of the evidence***. Thus, the district court's review is ***virtually de novo.***"

(emphasis added)(inner citations omitted)

<u>EXHIBITS AND CITATIONS TO ADMINISTRATIVE RECORD</u>

14.  This petition attaches the following exhibits

- Exhibit 1 - <u>Hearing Officer's Decision of May 3, 2019</u>

- Exhibit 2 - Mississippi Department of Education Office of Special Education "<u>PROCEDURES FOR STATE BOARD POLICY 74.19</u>" (also marked in administrative record as A-Rec. Identification Exhibit 3)

15.  Citations to the Administrative Record such as exhibits are designated as "A-Rec."  For example a cite to the student's exhibit 26, page 13, in the administrative record would be designated as: (A-Rec. P-Ex. 26 p.13)

16.  Citations to the Administrative Transcript are designated as "A-Tran."  For example a cite to page 145 lines 3-15 in the administrative transcript would be designated as: (A-Tran. 145:3-15)

<u>CONGRESSIONAL PURPOSE OF THE IDEA--PREVENTING SEGREGATION OR EXCLUSION OF DISABLED STUDENTS</u>

17. In 1954, a unanimous Supreme Court declared that "education is perhaps the most important function of state and local governments," in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The unanimous *Brown* opinion noted that the government deems education so important that a

parent is subject to criminal prosecution for failing to abide by compulsory

education laws.  *Brown* viewed an appropriate education as:

> "required in the performance of our most basic public responsibilities, even
> service in the armed forces. It is the very foundation of good citizenship.
> Today it is a principal instrument in awakening the child to cultural values,
> in preparing him for later professional training, and in helping him to adjust
> normally to his environment. In these days, it is doubtful that any child may
> reasonably be expected to succeed in life if he is denied the opportunity of
> an education. Such an opportunity, where the state has undertaken to
> provide it, is a right which must be made available to all on equal terms."
> Id., 347 U.S. At 493.

18. In enacting the IDEA, Congress was particularly troubled that disabled ***"children***
***were excluded entirely from the public school system and from being educated***
***with their peers."***  The wrongful exclusion of disabled children was one of four
principal purposes of enacting  IDEA.  20 USC Sec. 1400 ("Purposes").

19. Like *Brown v. Board of  Education*, IDEA law considers ***the physical placement***
***of the actual body of a student to be critical***. The U.S. Supreme Court has
observed that "Congress very much ***meant to strip schools of the unilateral***
***authority*** they had ***traditionally employed to exclude disabled students,***
***particularly emotionally disturbed students***, from school." *Honig v. Doe,* 484
U.S. 305, 323, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988)(emphasis added).

20. Contrary to this fundamental tenet of IDEA, JR was effectively expelled by the
school district and given a pretext of an education.  His IEP of October 25, 2017
permitted JR to attend school for only ***one hour per day***, and for only ***four days***

***per week.*** JR was taken to the assistant principal's office each day and secluded from all other children.  He would sit there for a single hour, in his chair, with his backpack remaining strapped to his back so that he could not even sit properly against the back of the chair.

<u>FIFTH CIRCUIT 2009 OVERVIEW OF SCHOOL DISTRICT
OBLIGATIONS UNDER THE IDEA</u>

21. In a 2009 Fifth Circuit opinion, *Houston Independent School v. VP Ex Rel. Juan P.*, 582 F. 3d 576, 583 (5th Cir. 2009), the IDEA was discussed as follows:

> One of the primary purposes of the IDEA is to ensure that children with disabilities receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). As "a local educational agency responsible for complying with the IDEA as a condition of the State['s]. . . receipt of federal education funding," [The District] must "(1) provide each disabled child within its jurisdictional boundaries with a `free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered ... in the ***least restrictive environment*** consistent with the disabled student's needs." *Michael F.,* 118 F.3d at 247 (citations omitted). These requirements are implemented through [The District's] development of IEPs for its disabled students. *Id.* Through a child's IEP, [The District] must provide a "basic floor of opportunity" that "consists of access to ***specialized instruction and related services which are individually designed*** to provide educational benefit to the [disabled] child." *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. [The District]  need not provide its disabled students with the best possible education, nor one that will maximize the student's educational potential. *Michael F.,* 118 F.3d at 247 (citing *Rowley,* 458 U.S. at 188-89, 102 S.Ct. 3034). "Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis;* rather, an IEP must be

*likely to produce progress, not regression or trivial educational advancement*." *Id.* at 248 (internal quotation marks and citation omitted). In short, [The District]  must provide its students with "meaningful" educational benefit. *Id.*

When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is twofold. The court must first ask whether the state has complied with the procedural requirements of the IDEA, and then *determine whether the IEP developed through such procedures was "reasonably calculated to enable the child to receive educational benefits."* *Rowley,* 458 U.S. at 206-07, 102 S.Ct. 3034.

THE UNANIMOUS SUPREME COURT DECISION IN ENDREW IN 2017

22. In 2017, IDEA's obligations were strengthened by Chief Justice Roberts, writing for a unanimous United States Supreme Court in *Endrew F. vs. Douglas County School District,* 137 S.Ct. 988 (2017). Academically, IDEA has two core expectations: (a) that most special education students will be on track to a regular diploma and will receive special education services enabling them to progress from *grade-to-grade with non-disabled peers*; and (b) that students with *significant cognitive impairments preventing grade-to-grade advancement will track on an alternate assessment program aligned to state standards*.

23.  This case is very similar to *Endrew.* In  *Endrew,* a child with autism "was afflicted by severe fears of common-place things like flies, spills, and public restrooms" and he was being *educated with an IEP that "largely carried over the same basic goals and objectives from one year to the next, indicating that he was failing to make meaningful progress toward his aims."* Although Endrew

displayed a number of strengths — his teachers described him as a humorous child with a "sweet disposition" who "showed concern for friends" —  he still ***"exhibited multiple behaviors that inhibited his ability to access learning in the classroom."***  "Endrew would scream in class, climb over furniture and other students, and occasionally run away from school. *Id.* at 1336.

<u>DISTRICT COURT REVIEW OF THE IEP</u>

24. The district court's review considers the four factors set out in *Houston Independent School v. VP Ex Rel. Juan P*., 582 F. 3d 576, 583 (5th Cir. 2009):

> We have set out four factors that serve as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," and these factors are whether  (1) the program is ***individualized*** on the basis of the student's assessment and performance; (2) the program is ***administered in the least restrictive environment***; (3) the ***services are provided in a coordinated and collaborative manner*** by the key `stakeholders'; and (4) ***positive academic and non-academic benefits are demonstrated***.

25.  In a unanimous 2017 United States Supreme Court opinion, Justice Roberts wrote that the IEP must be "appropriately ***ambitious*** in light of ***his circumstances***." Endrew F v. Douglas County School Dist. RE-1, 137 S. Ct. 988, 992 (2017) (emphasis added).

<u>THE DECISION OF THE HEARING OFFICER SUBJECT TO REVIEW UNDER 20 U.S.C. § 1415(I)(2)(C) AND THE TIMELINESS OF THIS REQUEST FOR REVIEW</u>

26. The administrative decision of the hearing officer appointed by the Mississippi Department of Education. ("MDE") dated May 3, 2019 is attached hereto as EXHIBIT 1 and incorporated as though fully set forth herein.  The due process hearing convened September 19, 2018. The hearing required fourteen days, with nine witnesses offered by the Complainant and seven by the Respondent District. (Ex. 1, p. 5 para. 4)

27. The Mississippi Department of Education Office of Special Education "*Procedures For State Board Policy 74.19*"  is attached hereto as EXHIBIT 2 and is incorporated as though fully set forth herein. It provides for an appeal from the hearing officer's decision within 90 days of the date of the decision.

28. This appeal is taken within 90 days of the hearing officer's decision on May 3, 2019.

<u>THE PRETRIAL PROCEEDINGS BELOW</u>

1. This matter commenced on August 6, 2018 with the <u>Petition for Due Process</u> filed by the student, JR. (Ex. 1, p. 5 para. 5)

2. The GDSC refused to provide JR's educational record to JR before the hearing began.  As the Hearing Officer noted, "[t]he Complainant made a request to the Respondent District for the Student's educational records. Those records were not provided. Neither did the District provide any documents to Complainant as part of the required prehearing disclosures." (Ex. 1, p. 5 para. 5)

3.  On August 7, 2018 the MDE directed the George County district to file response.[1]

    The MDE direction to the GCSD stated:

    > Pursuant to 34 C.F.R. 300.503; Miss. Admin Code 7-3:74.19, State Board Policy Chapter 74, Rule 74.19, 300.503, once a Due Process Hearing has been requested, if the District has not sent a prior written notice regarding the subject matter contained in the Due Process Complaint, the District must, within ten days of receiving the Due Process Request, send a response that includes: ***An explanation of why the agency proposed or refused to take the action raised in the Due Process Complaint; a description of other options that the IEP Committee considered and the reasons why those options were rejected; a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and a description of the other factors that are relevant to the agency's proposed or refused action.***"

    (emphasis added)

4.  On August 8, 2018, the district filed its answer to the petition in the form of a

    "PRIOR WRITTEN NOTICE" of the same date, and it stated in part:

    > "Public agencies are required to provide written notice to the parent when they propose or refuse to initiate or change the identification, evaluation, or educational placement of a child or propose or refuse to initiate or change the services and supports provided to a child which constitute a Free Appropriate Public Education (FAPE). This letter is your notice of the following action proposed or refused regarding your child, [JR]:

    > . . . .

    > "With the start of his educational career in George County School District, he began in an inclusion setting and has made his way through the continuum of services through the years based on his academic, social, cognitive and adaptive deficits. Prior to the decline in positive behaviors, Joshua was being serviced in an SC [self-contained] placement in the self-contained classroom. He was going through a regular school schedule ***including time with his non-disabled peers at breakfast, lunch,***

---

[1]

*enrichment (PE), recess breaks and school activities.* Joshua's most recent comprehensive evaluation was in March 2017, where he assessed using the Wechsler Nonverbal Scale of Ability that identified his *IQ to be 42* and the Vineland Adaptive Behavior Scales that indicated that his adaptive behavior composite score to be 40. Due to all data and assessment collected and reviewed during his most recent comprehensive reevaluation, Joshua is determined to be in the *category of Significant Cognitive Disability* that means his instruction would be *alternatively assessed* and he would be taught the Essential Elements curriculum with goals in all of his deficit areas.

. . . .

"Joshua was evaluated for a functional behavior assessment in October 2017 that identified that the *function of his behavior to be his way of communicating frustration when he does not have the words to express his thoughts.* A BIP was developed to target specific behavior and to teach strategies to improve his behavior. At [an] *October 5, 2017 IEP meeting*, the committee discussed and modified his school day to *half a day* to prevent him from being over- stimulated and frustrated. On *October 25, 2017 another IEP meeting was held to shorten Joshua's school day to 1 hour each day.*

. . . .

"The IEP committee researched and discussed the parents' request for the district to contract with a BCBA company and for an individual behavioral aid to be assigned to Joshua. The district did make attempts to get information regarding *contracting with two different companies for ABA therapy* including *the company that employs the BCBA and BCaBA therapists that his parents are working with to provide ABA therapy* to Joshua. *Since that was unable to be obtained the LEA began the process* of *contracting with a company* that provides *ABA therapy* through other mean [sic] and *went into a contract* with **Teachtown,** a computer programming including teacher professional development (Teachtown). The George County School District has *worked with [JR]'s BCaBA* to allow her to observe his behavior in the school setting. At that time she met with the Joshua's teachers and positive behavioral specialist to discuss her observations, data and input. Her information and input was considered and *used in developing his 18-19 IEP* and BIP including her presence in IEP meetings on 2-28-18, 4-25-18, 5-11-18 and 5-21-18. *The IEP committee*

> ***considered the request for an individual behavior aid for Joshua,
> however they rejected the idea due to concerns of further restricting his
> environment and causing Joshua to develop a co-dependency of that
> individual.*** However in response to the consideration of Joshua's parents'
> request for ***an individual aid, an aid was moved from a different school*** by
> the LEA and approved at the July 10, 2018 board meeting in order to
> provide George County Middle School with an additional aid in order to
> help service Joshua and other students as needed.

5.  On August 16, 2018, the district filed a supplemental answer, with Exhibits A,

    Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F, and Exhibit G. (Id.) The

    district's supplemental answer admitted that JR had been reduced from a full day

    of school to 4 hours of school per day on October 5, 2017, and ***twenty days later***,

    that JR had been reduced to 1 hour of homebound school per day on October 25,

    2017:

    > "***On October 5, 2017***, the IEP committee met and determined that Joshua
    > would receive special education and related services by attending ***1/2
    > schools days*** instead of full days." (P.3 para. 9)(emphasis added)

    > "After the behaviors continued, on ***October 25, 2017***, the IEP committee
    > met and determined that special education and related services in an
    > alternative setting, homebound, was the least restrictive environment (LRE)
    > in which to provide Joshua a free and appropriate public education (FAPE).
    > The committee determined that Joshua would receive homebound services,
    > to include both special education and related services, at Rocky Creek
    > Elementary School, Monday through Thursday, ***for one hour each day***.
    > Homebound services have been provided by a special education teacher."

    > (A-Rec., p.3 para. 9)(emphasis added)

6.  The district's supplemental answer agreed that JR had the following

    characteristics:

"[JR] was diagnosed with a genomic imbalance, the missing genome being a 16p13.11 deletion." (P.2 para. 3)

"[JR] did not begin speaking until he was around seven years old." (P.2 para. 7)

"[JR]'s primary eligibility category is multiple disabilities with autism and intellectual disability. Pursuant to the IDEA, 'Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are ***engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.'***" (P.2 para. 6)

7.  The district's August 16, 2018 supplemental answer asserted that FAPE had been provided to JR during the 2017-2018 school year (when JR was reduced to ½ a day five days a week, then to 1 hour per day) and ***asserted that the GCSD would continue to provide FAPE during the 2018-2019 school year***.  Specifically, the GCSD pleaded that at "the beginning of the 2017-2018 school year, the District took reasonable steps to provide Joshua with access to his non-disabled peers, including breakfast time, lunch, enrichment activities such as physical education, recess breaks and school activities. The District ***will continue*** to take reasonable steps to provide Joshua with access to his non-disabled peers ***during the 2018-2019 school year***."  (See supplemental answer p.8 last full paragraph)

<u>THE DISTRICT KNEW IT WAS NOT PROVIDING FAPE BEFORE THE DUE PROCESS HEARING EVER BEGAN, AND DID NOTHING DURING THE ENTIRE PERIOD OF AUGUST 20, 2018 TO MAY 3, 2019 TO PROVIDE FAPE</u>

8. On August 20, 2018, the resolution meeting was held.[2]  The Special Education Director for the school district, Donna Dixon ("The SPED Director"), knew that on that day that the district was not providing FAPE. (A-Tran. 641:7-642:22)

9. Accordingly, despite pleading only four days before in its supplemental answer that FAPE had been provided to JR and **was being provided during the in session 2018-2019** school year then in session, the school district knew that it was not providing FAPE, and knew that it was not providing FAPE before the due process hearing even began. (A-Tran. 641:7-642:22)

10. The first day of the hearing was on September 19, 2018.  Shortly after, JR was **suspended from school**. (A-Tran. 815:8)  Afterwards, JR did not attend school **at all**, including non-attendance through the Hearing Officer's decision on May 3, 2019.  (A-Tran. 908:1) See, e.g., <u>Goss v. Lopez</u>, 419 U.S. 565, 574-576, (1975)(deprivation of school for more than 10 days entitles child to due process rights, because "the total exclusion from the educational process for more than a trivial period, and certainly **if the suspension is for 10 days, is a serious event in the life of the suspended child.**")(emphasis added).   Likewise, JR's exclusion

---

[2] 300.510 Resolution process.  "(a) Resolution meeting. (1) Within 15 days of receiving notice of the parent's due process complaint, and prior to the initiation of a due process hearing under §300.511, the LEA must convene a meeting with the parent and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the due process complaint that—(i) Includes a representative of the public agency who has decision-making authority on behalf of that agency; and (ii) May not include an attorney of the LEA unless the parent is accompanied by an attorney."

from school by the GCSD for virtually the entire 2018-2019 year was a "serious

event," yet the GCSD did nothing to cure its admitted inability to provide FAPE.

THE HEARING OFFICER'S IDENTIFICATION OF ISSUES FOR DECISION

11. On September 12, 2018, the IHO clarified the issues for the hearing: " All items

stated 19, under section 3 of [the student's] filing styled "The Student Pre-Hearing

Report" will be open for consideration at the hearing, subject to objections as may

be made at the time of the hearing."  The issues for the hearing included:

> *[4] "Whether the child was denied FAPE for the two years preceding the filing for due process[?]*
>
> *[6] Whether the child has been denied FAPE because he has been denied an appropriate BCBA evaluation, an appropriate BIP, and an RBT trained to fidelity to implement a BIP designed to include petitioner in an educational environment with his non-disabled peers to the maximum extent[?]*
>
> *[7] Whether the child should at all times be in the physical presence of and receive the assistance of a designated one-on-one paraprofessional who shall be trained by the BCBA, in order to maximize the LRE[?]*
>
> *[8] Whether the child has been denied FAPE because he has been denied the opportunity to participate in nonacademic and/or extracurricular activities with his/her nondisabled peers[3][?]*

---

[3] Under 34 CFR 300.117, regarding "Nonacademic settings," IDEA requires that "[i]n providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in §  300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings."  (emphasis added)

*[9] Whether the child has been denied FAPE because he has been denied a specially designed physical education[?]*

(Exhibit 1, Hearing Officer Decision at pp. 2-5)((emphasis added).

## JR WAS DENIED FAPE FROM OCTOBER 25, 2017 TO MAY 3, 2019, DUE TO A COMPLETE DENIAL OF PHYSICAL EDUCATION BY THE GCSD

12. The Hearing Officer's decision identified the following issue for determination in the due process proceedings below: **"9. *Whether the child has been denied FAPE because he has been denied a specially designed physical education*?"** (Ex. 1, p. 4 para. 9; see also complaint for due process at para. 26(a)-(p))

13. The IDEA at 20 U.S.C. § 1401(29) states:

> The term ***"special education" means*** specially designed instruction, at ***no cost*** to parents, to meet the ***unique needs*** of a child with a disability, ***including***: (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; ***and (B) instruction in physical education.***

> (emphasis added).

14. Physical education is thus a mandated component of FAPE. To this end, 34 CFR Sec. 300.108, required the GCSD to provide a physical education component of FAPE either by physically educating JR with the non-disabled children in the "regular physical education program" or by providing him with a "specially designed physical education":

> "Physical education services, specially designed if necessary, ***must be made available to every child with a disability*** receiving FAPE, unless the public agency enrolls children without disabilities and does not provide physical education to children without disabilities in the same grades.

(b) Regular physical education. Each child with a disability ***must be afforded the opportunity to participate in the regular physical education program*** available to nondisabled children ***unless***—

(1) The child is enrolled full time in a separate facility; or

(2) ***The child needs specially designed physical education, as prescribed in the child's IEP.***

(c) Special physical education. If specially designed physical education is prescribed in a child's IEP, the public agency responsible for the education of that child must provide the services directly or make arrangements for those services to be provided through other public or private programs.

(d) Education in separate facilities. The public agency responsible for the education of a child with a disability who is enrolled in a separate facility must ensure that the child receives appropriate physical education services in compliance with this section."

15. JR's special education teacher for the 2017-2018 school year testified, "JR loved being around children [other students].  But it was very hard with his language deficits to communicate or  have circles of communication with other children so it therefore made him more isolated to get on the swing and swing. . .  He just wasn't able to communicate in the way he wanted to." (710:8-24)

16. The Hearing Officer found as a fact that the student, as of March 8, 2017, "continued to go to recess and physical education with his regular education third grade class." (Ex. 1, p. 9 para. 19)

17. However, the student proved at the due process hearing that JR received ***no physicial education of any kind*** after the GCSD reduced his time at school to one

hour per day, four days per week, on October 25, 2017.  ( at 843:22)  Nor did the

student receive any physical education through the conclusion of the due process

proceedings which began on August 6, 2018, and ended with the Hearing Officer's

decision on May 3, 2019.

18. In accordance with this undisputed evidence, the Hearing Officer found as a fact

that physical education had been completely denied, in his order at paragraph 98:

"The October 25, 2017, amendment [to the IEP] restricted the Student's school

week to but four hours (three hours of academic, a half hour of occupational

therapy, and a half hour of speech therapy). ***What is more, the amended program***

***eliminated physical education, required to be provided by §300.308 from the***

***Student's Curriculum.***"  (Ex. 1, p.32 para. 98)(emphasis added). The same

finding of fact had occurred earlier in the hearing.  (Ex. 1, p.15 para. 32).

19. However, despite these findings of fact, the Hearing Officer entered a finding that

"the Complainant put on ***no evidence*** during the course of the hearing regarding

the above physical education issues, and, accordingly, I do not find FAPE has

been denied in that regard."  (Ex. 1 p. 37 para. 111)(emphasis added).

20. This conclusion of law was incorrect, and accordingly, a conclusion of law is due

to be entered that the student was denied FAPE during the period October 25,

2017 through the filing of the due process complaint on August 6, 2018, and

through the entire 2018-2019 school year when the Hearing Officer issued its

decision on May 3, 2019, based on the undisputed fact that the GCSD completely

denied the student an IDEA mandated physical education.[4]

### JR WAS DENIED FAPE DURING THE TWO YEARS PRECEDING THE DUE PROCESS COMPLAINT BECAUSE HE WAS EXCLUDED FROM SCHOOL AND ALLOWED TO ATTEND ONLY ONE HOUR PER DAY, FOUR DAYS A WEEK, BEGINNING OCTOBER 2017

21.  The Hearing Officer's decision identified the following issue for determination in

the due process proceedings below: ***"4. Whether the child was denied FAPE for***

***the two years preceding the filing for due process?"***  (Ex. 1, p. 4 para. 9; see also

complaint for due process at para. 26(a)-(p))   On May 3, 2019, the due process

officer incorrectly concluded that the student had not been denied FAPE during

the two years preceding the filing of the complaint.  (Ex. 1, pp. 33-34 para. 102).

This finding was erroneous due to the denial of physical education alone, but for

many additional reasons, as shown herein.

22. To determine JR's October 2017 reduction in school time to only one hour per

day, four days a week was "appropriate" within the meaning of FAPE, the Fifth

Circuit utilizes ***hindsight evidence***. *See  Houston Indep. Sch. Dist. v. V.P. ex rel.*

---

[4] The Hearing Officer's conclusion that FAPE's physical education component ***had been provided*** was even shown incorrect by the Hearing Officer's final order of May 3, 2018.  After the filing for due process on August 6, 2018, the GCSD admitted that it knew on August 20, 2018, before the 14 days of hearing ever began, that the GCSD was not providing FAPE. Yet the GCSD did nothing to provide FAPE (which includes physical education) during the entire 2018-2019 school year.  Since the GCSD did nothing to provide FAPE during the entire 2018-2018 school year, the Hearing Officer in his decision on May 3, 2019 ordered the GCSD to convene an IEP meeting and formulate an IEP that would provide FAPE, including ***"physical education."***  (Ex. 1, p. 39 para. 116)

*Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) (calling **demonstrated academic and non-academic benefits "one of the most critical factors" in the analysis of whether a school district has provided a FAPE)**(emphasis added)**.**

23.  The most glaring hindsight evidence is that **JR's behavior deterioration was directly positively correlated to the school reducing his school time** from: (a) eight hours a day, as non-disabled children attend; (b) to four hours per day in early October 2017; (b) to only one hour per day, on a few weeks later in October 2017.

24.  The district's supplemental answer admitted that JR had been reduced from a full day of school to 4 hours of school per day on October 5, 2017, and **twenty days later**, that JR had been reduced to 1 hour of homebound school per day on October 25, 2017:

> "**On October 5, 2017**, the IEP committee met and determined that Joshua would receive special education and related services by attending **1/2 schools days** instead of full days." (P.3 para. 9)(emphasis added)

> "After the behaviors continued, on **October 25, 2017**, the IEP committee met and determined that special education and related services in an alternative setting, homebound, was the least restrictive environment (LRE) in which to provide Joshua a free and appropriate public education (FAPE). The committee determined that Joshua would receive homebound services, to include both special education and related services, at Rocky Creek Elementary School, Monday through Thursday, **for one hour each day**. Homebound services have been provided by a special education teacher."

> (A-Rec., p.3 para. 9)(emphasis added)

25. The district's "Positive Behavior Intervention Specialist," Sonya Dena Rogers,

   testified that a disabled child is expected under IDEA to attend school for the same

   period of time that non-disabled children attend:

> 20 Q. Was the IEP team aware that in the
> 21 special education regulations in the State of
> 22 Mississippi and the Federal regulations, that a
> 23 full school day is considered to be the same as
> 24 a non-disabled child?
> 25 A. Yes, sir.
>
> (A-Tran. 919-921)
>
> . . . .
>
> 7 Q. What is a normal school day for a
> 8 non-disabled child?
> 9 A. 7:15 to 3:30.
> 10 Q. Okay. And do you agree that a
> 11 disabled child is supposed to attend school the
> 12 same as a nondisabled child?
> 13 A. They are supposed to, yes, sir.
>
> (A-Tran. 919-921)

26. The GCSD's "Positive Behavior Intervention Specialist" admitted that JR's

   aggressive behaviors have increased correspondingly to his decreased time at

   school. (A-Tran. 1035:13)

> *13 Q. And do you agree that as his*
> *14 behavior -- his aggressive behavior has*
> *15 increased, correspondingly -- do you agree that*
> *16 as his negative behaviors have increased, the*
> *17 school has correspondingly decreased his time at*
> *18 school?*

22

19 A. Yes.

20 Q. And your opinion is that's a positive

21 development for this child?

22 A. I don't necessarily know that I would

23 call it a positive development in the sense that

24 I believe you are trying to get at. What it is

25 is providing him with an opportunity to be in a

1 situation where we can work with him one-on-one

2 with those behaviors and extinguish those

3 behaviors, get rid of the negative behavior and

4 replace it with a positive. And in that sense,

5 yes, it is a positive.

**6 Q. And how effective has that response**

**7 been of giving him the opportunity to come to**

**8 school one hour a day and be with no peers in**

**9 the vice-principal's office, how has that**

**10 experience improved his behaviors?**

**11 A. At this time the behaviors have**

**12 escalated.**

(A-Tran. 1035:13)(emphasis added).

27. The GCSD's "Positive Behavior Intervention Specialist" was unable to express

any reasoned rationale for reducing JR's school time from 4 hours to 1 hour in

October 2017:

23 This was considered to be a positive response to

24 his behavior, his unacceptable behavior to

25 reduce him to one hour per day, right?

1 A. To give him -- yes. To give him a

2 better chance and give the teacher working with

3 him and myself a better my chance to extinguish

4 the negative behavior through positive things we

5 were doing like the work think board, like

6 redirecting of behavior, over teaching the
7 positive behavior and those types of things. If
8 you are working one-on-one with someone or
9 two-on-one with a student, that student is going
10 to have your whole, sole focus as a teacher.
11 Q. And so why wouldn't it be four times
12 better to have the student get that sole focus
13 for four hours a day instead of one?
*14 A. Because in a situation where he's at*
*15 school four hours a day, that's a classroom*
*16 situation. That's not a situation where he*
*17 would be one-on-one.*
*18 Q. Why not? If that's what is*
*19 appropriate, then it would be if it's*
*20 appropriate for him to receive four hours a day*
*21 one-to-one teaching with an aide, then you*
*22 understand that's what IDEA requires, right?*
*23 A. It does. But that's not the decision*
*24 that was made…."*

(A-Tran. 1033:23)(emphasis added).

28.  Near the conclusion of the hearing, Kelly Huber, the Acting SPED Director for

the GCSD, testified at p. 2012 that the primary consideration of the 1 hour per day

was not the individualized education plan for JR, but for the safety of other

students and staff.

1 Q. If he is in school eight hours a day or
 2 seven hours a day, whatever it is, wouldn't you
3 have many more opportunities to reinforce
4 appropriate behaviors than if he were just there
5 for one hour a day?
6 MS. DAY: Objection, leading.
7 HEARING OFFICER: He can lead he is on

8 cross-examination. Go ahead. Overruled.
*9 A. Yes, you have more opportunities to teach*
*10 that; however, the responsibility of the district*
*11 is to provide a safe learning environment for all*
*12 of our students and for our staff.* So we also have
13 to take into consideration the danger that he is to
14 not only himself but to others.

(A-Tran. 2012)

29. Leah Wilinks, the 2016-2018 SPED Teacher agreed that special education doctrine considers the removal of children from an educational environment with either disabled peers or nondisabled peers and placement in homebound to be the most restricted environment. ("LRE") (A-Tran. 793:13)

30. The GCSD Director of Special Education, Donna Dixon ("The SPED Director") held her position for many years, and retired in September 2018 after the filing of JR's request for due process in August 2018. (A-Tran. 560:1)  She was the GCSD SPED Director at all material times leading up to the August 2018 request for due process filing by JR.  She was "absolutely not" involved in the reduction of JR's time from a full school day to ½ a day on October 5, 2017 and had not been involved in the decision of cutting JR's school time to one hour per day, only days per week on October 25, 2017.  (A-Tran. 575:13)  She did not know who on the IEP team had suggested it. (A-Tran. 575:20)  The SPED Director agreed *the*

***homebound classification of JR had been made independent of her knowledge
as director of special education.*** (A-Tran. 601:1)

31. The SPED Director was asked as "director of special education" to assess the
"reasonableness of reducing a child's educational experience to just ***four hours a
week when he has all of these deficits***," she admitted, ***"You're asking me to
justify something when I don't have the information to justify."*** (A-Tran.
604:13-605).

32. The United States Supreme Court stated in *Endrew F v. Douglas County School
Dist. RE-1*, 137 S. Ct. 988 (2017), that "[a] reviewing court may fairly expect
those [school district] authorities to be ***able to offer a cogent and responsive
explanation for their decisions that shows the IEP is reasonably calculated to
enable the child to make progress*** appropriate in light of his circumstances."  A
non-disabled child attends school approximately 35 hours per week (7 x 5) or
more.  After reducing JR's school time to only 4 hours per week, the GCSD had
no "cogent and responsive" explanation for excluding JR from at least 31 hours
hours of school that non-disabled children receive.

33. The reduction of JR's school time to one hour per day, only four days per week,
was a clear violation of JR's rights because his behavior was a manifestation of his

disability.[5] Standing alone, demonstrates that the IEP amendment of October 25,

2017 was not appropriate and denied him FAPE.

<u>JR WAS DENIED FAPE FROM OCTOBER 2017 TO THE PRESENT
BECAUSE HIS IEP WAS NOT BASED ON EVALUATIONS, BUT RATHER,
WAS ADMITTED BY THE GCSD TO BE INAPPROPRIATE</u>

34. The Supreme Court in 2017 in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch.*

*Dist. RE-1,* 137 S.Ct. 988, 993, 197 L.Ed.2d 335 (2017) emphasized the role of the

IEP, in the following verbatim excerpts:

> A FAPE, as the Act defines it, includes both "special education" and
> "related services." § 1401(9). "Special education" is "specially designed
> instruction ... to meet the unique needs of a child with a disability"; "related
> services" are the support services "required to assist a child ... to benefit
> from" that instruction. §§ 1401(26), (29). A State covered by the IDEA
> must provide a disabled child with such special education and related
> services "***in conformity with the [child's] individualized education
> program," or IEP.*** § 1401(9)(D).

---

[5] On October 5, 2017, the district wrote a functional behavior plan.  (A-Rec., GDSDs supplemental answer, Exhibit F at p. 1).  Only nineteen days later, the district held a manifestation determination hearing after JR had engaged in additional aggressive behavior.  (Id. at p.5)  It was determined that "JR 's IQ and other disabilities ***prevent him from understanding the negative consequences of his aggressive behaviors"*** and further stated that JR's ***"behavior subject to disciplinary action"*** was ***"a manifestation of the student's disability."*** (Id.)  Yet, despite finding that the behavior was a manifestation of autism, the committee reduced JR from 4 hours of day of school, to 1 hour per day of school four days a week. (Id.)  This was a stark violation of JR's legal right under  20 U.S.C. § 1415(k)(1)(F)(iii) to be returned to the LRE placement from which he or she was removed if the behavior that gave rise to the child's violation of the school's code of conduct is determined to be a manifestation of the child's disability.  The IDEA provides that, where a disabled child's ***"change in placement" "would exceed 10 school days*** and the behavior that gave rise to the violation of the school code is determined ***not*** to be a ***"manifestation of the child's disability"***, the "interim alternative educational setting" shall be determined by the IEP team. 20 U.S.C. § 1415(k)(2); *see also* 34 C.F.R. § 300.530(d)(5).  But the GCSD had determined that JR"s behavior ***was a manifestation of his disability.***

27

The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require ***careful consideration of the child's individual circumstances.*** § 1414. The IEP is the means by which special education and related services are ***"tailored to the unique needs" of a particular child***. *Rowley,* 458 U.S., at 181, 102 S.Ct. 3034.

The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services ... that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV).

. . . .

To meet its substantive obligation under the IDEA, ***a school must offer an IEP reasonably calculated to enable a child to make progress*** appropriate in light of the child's circumstances.

The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. *Id.,* at 207, 102 S.Ct. 3034. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. *Id.,* at 208-209, 102 S.Ct. 3034. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal. *Id.,* at 206-207, 102 S.Ct. 3034.

***The IEP must aim to enable the child to make progress.*** After all, the essential function of an IEP is to set out a plan for pursuing ***academic and functional advancement.*** See §§ 1414(d)(1)(A)(i)(I)-(IV). This reflects the

broad purpose of the IDEA, an "ambitious" piece of legislation enacted "in response to Congress' perception that *a majority of handicapped children in the United States `were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out."'*" *Rowley,* 458 U.S., at 179, 102 S.Ct. 3034 (quoting H.R.Rep. No. 94-332, p. 2 (1975)). A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act.

That the progress contemplated by the IEP must be appropriate in light of the child's circumstances should come as no surprise. *A focus on the particular child is at the core of the IDEA.* The instruction offered must be "*specially* designed" to meet a child's "*unique* needs" through an "[*i*]*ndividualized* education program." §§ 1401(29), (14) (emphasis added). *An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth.* §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv). As we observed in *Rowley,* the IDEA "requires participating States to educate a wide spectrum of handicapped children," and "the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." 458 U.S., at 202, 102 S.Ct. 3034.

*Rowley* sheds light on what appropriate progress will look like in many cases. There, the Court recognized that the IDEA requires that children with disabilities receive education in the regular classroom "whenever possible." *Ibid.* (citing § 1412(a)(5)). When this preference is met, "the system itself monitors the educational progress of the child." *Id.,* at 202-203, 102 S.Ct. 3034. "Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material." *Id.,* at 203, 102 S.Ct. 3034. Progress through this system is what our society generally means by an "education." And access to an "education" is what the IDEA promises. *Ibid.* Accordingly, for a child fully integrated in the regular classroom, an IEP typically should, as *Rowley* put it be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.,* at 203-204, 102 S.Ct. 3034. This guidance is grounded in the statutory definition of a FAPE. *One of the components of a FAPE is "special education," defined as "specially designed instruction... to meet the unique needs of a child with a disability."* §§ 1401(9), (29). In determining what it means to "meet the unique needs" of a child with a

disability, the provisions governing the IEP development process are a natural source of guidance: I*t is through the IEP that "[t]he `free appropriate public education' required by the Act is tailored to the unique needs of" a particular child. Id.,* at 181, 102 S.Ct. 3034.

The IEP provisions reflect *Rowley*'s expectation that, for most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade. ***Every IEP begins by describing a child's present level of achievement, including explaining "how the child's disability affects the child's involvement and progress in the general education curriculum***." § 1414(d)(1)(A)(i)(I)(aa). It then sets out "a statement of measurable annual goals... designed to ... enable the child to be involved in and make progress in the general education curriculum," along with a description of specialized instruction and services that the child will receive. §§ 1414(d)(1)(A)(i)(II), (IV). The instruction and services must likewise be provided with an eye toward "progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV)(bb). Similar IEP requirements have been in place since the time the States began accepting funding under the IDEA.

The school district protests that these provisions impose only procedural requirements — a checklist of items the IEP must address — not a substantive standard enforceable in court. Tr. of Oral Arg. 50-51. But the procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to "meet the unique needs" of a child with a disability. §§ 1401(9), (29). When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum.[2]

*Rowley* had no need to provide concrete guidance with respect to a child who is not fully integrated in the regular classroom and not able to achieve on grade level. That case concerned a young girl who was progressing smoothly through the regular curriculum. ***If that is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement. But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious*** for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives.

Of course this describes a general standard, not a formula. But whatever else can be said about it, this standard is markedly more demanding than the "merely more than *de minimis*" test applied by the Tenth Circuit. ***It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than de minimis progress for those who cannot.***

When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. ***For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly ... awaiting the time when they were old enough to `drop out.'"*** *Rowley,* 458 U.S., at 179, 102 S.Ct. 3034 (some internal quotation marks omitted). ***The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."***

35. The GCSD was required to perform a "[r]eview of existing evaluation data" ("REED"). 20 U.S.C. § 1414(c)(1). The REED must include "evaluations and information provided by the parents," "current classroom-based, local, or State assessments, and classroom-based observations," and "observations by teachers and related services providers." *Id.* "Upon completion of the administration of assessments and other evaluation measures[,] the determination of whether the child is a child with a disability . . . and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child." 20 U.S.C. § 1414(b)(4).

36. The testimony of the school psychometrist, Kim Davis, was undisputed: JR's IQ is 42.   JR's IQ of 42 places him at the 0.01 percentile--the 100th of the 1 percentile.

(A-Tran. 656:12) JR is therefore profoundly intellectually disabled (A-Tran. 657:13) Davis testified that the scale traditionally given to children is the Wechsler Intelligence Scale for Children, 5th Edition, (A-Tran. 661:3).  The WISC5 requires having a conversation with the child. (A-Tran. 662:16)  But Davis elected a non-verbal variety because JR lacked the verbal skills to answer the verbal edition. (A-Tran. 662:5) His non-verbal examination permitted him to "touch the answers." (A-Tran. 662:21) Davis testified regarding JR's adaptive behavior skills, as measured by the Vineland assessment. (A-Tran. 663:5-22) JR also scored in "less than 1 percent" in all areas. (A-Tran. 663:23-666:15) Davis agreed a child ***"really can't go much lower than that."*** (A-Tran. 666:13) Davis agreed that all three tests confirmed that JR is functioning at "[t]he lowest, .01 percent, of the general population at his chronological age." (A-Tran. 669:10-670:16)  Davis testified she **would not expect JR to be able to perform third grade work, or fourth grade work, or fifth grade work.** (A-Tran. 673:15)

37. The SPED Director agreed an "IEP follows the child throughout his [or her] educational career" and that it is extremely important that the information that is included in an IEP is done correctly." (A-Tran. 622:18)   The SPED Director agreed the IEP was to set goals for a 12 month period of time in measurable annual goals stated in an understandable way. (A-Tran. 562:1), because the *Procedures for State Board Policy 74.19* (Ex. 2 p. 11) directed that an "IEP must

be designed to indicate what the child is year expected to be able to achieve within one year." (A-Tran. 564:11).   The SPED Director agreed that the IEP "provides for **accountability** in that it establishes these ***measurable annual goals and puts the teacher, the educator, in the position of evaluating whether or not that annual goal has been mastered.***" (A-Tran. 566:9)(emphasis added).

38. The SPED Director agreed "there should be some documentation some place on the IEP as to whether or not that child has mastered those measurable  annual goals." (A-Tran. 568:15)  The SPED Director agreed that "in addition to the measurable annual goals, the IEP has either short term objectives or benchmarks," to show "progression toward the achievement of the measurable annual goal." (A-Tran. 568:19-569:7)

39. The MDE *Procedures for State Board Policy 74.19* provides, regarding "Components of the IEP" at p. 23: "The IEP must contain the following data-informed components:  The child's Present Levels of Academic Achievement and Functional Performance (PLAAFP)."  This MDE simply restates the standard set forth in IDEA.   The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's

progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III).

However, The SPED Director for the GCSD for many years, *did not know that*

*"PLAAFP" stood for.* (A-Tran. 583:6-584:15)

40. The SPED Director agreed that she, as the special education coordinator for the

school, should be able to read the IEP and evaluate it. (A-Tran. 600:23) The SPED

Director agreed that *the "stranger test" for IEPs is that a teacher can pick up the*

*IEP and know what is intended in the measurable annual goal, and that the IEP*

*should be written that way.* (A-Tran. 589:15) To this end, the United States

Supreme Court stated in *Endrew F v. Douglas County School Dist. RE-1*, 137 S.

Ct. 988, 992 (2017), that "[a] reviewing court may fairly expect those [school

district] authorities to be *able to offer a cogent and responsive explanation for*

*their decisions that shows the IEP is reasonably calculated to enable the child to*

*make progress* appropriate in light of his circumstances."

41. However, the SPED Director could not explain how the 2016-2017 IEP was

reasonably calculated to enable JR to make progress.  The  first measurable annual

goal was, "JR will work on phonics and decode words  and use words applied with

70 percent accuracy and measured five out of ten trials by the end of school year."

(A-Tran. 588:8) The SPED Director at the time this IEP was written *could not*

*explain what this meant.*  ("Q.  All right. What phonics is he supposed to be

using? A.Whichever ones he needs to decode the words he's looking at, I assume.

Q. What words are those?  A. I don't know.") (A-Tran. 589:1)

42. The SPED Director admitted she could not tell what was intended by this annual

goal to "decode" words. (A-Tran. 589:21)  She admitted the "short term"

objectives were the same as the annual goal. (A-Tran. 589:25).  The SPED

Director agreed this  was ***not appropriate*** and was a mistake committed because

"[t]he teacher needs more training" in writing an IEP. (A-Tran. 589:8)

43. On the "Fine Motors Skills" section of the IEP, The SPED Director admitted that

the IEP team "needed more training because it was ***not properly done***." (A-Tran.

593:8)

44. The next IEP goal in math stated, "In 36 weeks JR will ***find the perimeter of***

***simple shapes during a math activity*** with the 70 percent accuracy with three out

of four attempts during three out of four attempts." (A-Tran. 596:9)  ***JR has an IQ***

***of 42, and finding the "perimeter" "during math activity" was clearly***

***inappropriate.***

45. The IEP goal intended to "desensitize" JR's oral motors skills was to give him a

vibrating toothbrush was also improperly written, the SPED Director admitted.

(A-Tran. 613:2)

46. The IEP goal on "cardinal counting, using manipulatives to understand numbers

and representing qualities with  corresponding numerals during three out of four

attempts with 70 percent accuracy during four  consecutive math activities" was also improperly written, the SPED Director (A-Tran. 614:4-615:3)

47. The IEP stated that "JR had "mastered" the skill of being "able to answer what questions in clear expression after hearing ***grade level text*** . . ." (A-Tran. 616:17) JR has an IQ of 42, and this goal was inappropriate, and contrary to the findings of the psychometrist concerning JR's ability to perform at grade level.  Further, this is an inappropriate goal, because JR is ***not on a grade level academic program***, but rather, an alternative assessment program for a student who cannot be expected to perform at grade level.

48. The IEP for 2018-2019 was prepared on May 21, 2018. (P-Ex 6 in the hearing record; doc. 51; 625:18)  The measurable annual goals were written incorrectly, the SPED Director admitted, and she had been present that day on the IEP team. (A-Tran. 626:19-627:13)  When asked what an "appropriate form of communication" would be for JR, the SPED Director admitted the IEP incorrectly omitted this element. (A-Tran. 627:16) ("Q. Why is it not listed in the IEP? A. I don't know. Q. It should be, shouldn't it?  A. Yes.")  The SPED Director further admitted the IEP had no explanation of the appropriate form of communication JR was going to receive, and therefore, it was not measurable. (A-Tran. 628:20) SPED Director further admitted the 2018-2019 IEP called for JR to master "basic mathematical equations," but since no equations of any type were identified, it was

not measurable. (A-Tran. 629:1)   The SPED Director continued to admit the 2018-2019 IEP was incorrectly written. The special education services page called for speech language services, but detailed no services. (A-Tran. 632:16) It prescribed occupational therapy services, but detailed no services. (A-Tran. 632:20)

49. The SPED Director understood  that **_"Applied Behavioral Analysis" (ABA) to be "a methodology of how to teach children specifically with autism."_** (A-Tran. 530:8) She knew of no one in the district who had knowledge of ABA. (A-Tran. 530:13) She never saw ABA in practice with JR. (A-Tran. 531:8) When asked what part of ABA she was knowledgeable of, she said "not a whole lot." (A-Tran. 532:4)

50. The SPED Director was not familiar with the term "peer reviewed research."[6] (A-Tran. 556:18; 557:8; 558:18) She had never discussed the term at any of the Mississippi special education conferences, or in-services she attended. (A-Tran. 557:5)

51. The SPED Director admitted that after this due process action had been filed, she wrote a letter to the parent knowing that the district could not provide FAPE. (A-Tran. 641:7-642:22) Dixon confirmed the district's inability to provide FAPE by her testimony. ("Q.  So your position at the time you wrote this letter was that the school system was not capable of providing FAPE? A.  Yes.") However, the GCSD continued to litigate for the entire 2018-2019 school year, knowing it could not provide FAPE to JR.

---

[6] IDEA regulation § 300.320 defines an "individualized education program":  "IEP means a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with §§300.320 through 300.324, and that ***must include***. . . (4) A statement of the special education and related services and supplementary aids and services, based on ***peer-reviewed research*** to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child—(i) To advance appropriately toward attaining the annual goals; (ii) To be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section, and to participate in extracurricular and other nonacademic activities; and (iii) To be educated and participate with other children with disabilities and nondisabled children in the activities described in this section."  Federal Register Volume 71, Number 156 (8/14/2006) defines "peer-reviewed research'' as "research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published." (P.46664)  Federal Register Volume 71, Number 156 (8/14/2006) further states that IDEA "requires special education and related services, and supplementary aids and services, to be based on peer reviewed research to the extent practicable. States, school districts, and school personnel must, therefore, select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available." (P. 46665)

52. Based on the testimony of the SPED Director alone, it is clear that the IEP did not

    provide FAPE.  The Hearing Officer incorrectly concluded that the GCSD

    provided FAPE to the student during the two years preceding the August 6, 2018

    due process complaint.

53. The district court's review considers the four factors set out in *Houston*

    *Independent School v. VP Ex Rel. Juan P.*, 582 F. 3d 576, 583 (5th Cir. 2009):

> We have set out four factors that serve as "indicators of whether an IEP is
> reasonably calculated to provide a meaningful educational benefit under the
> IDEA," and these factors are whether  (1) the program is ***individualized*** on
> the basis of the student's assessment and performance; (2) the program is
> ***administered in the least restrictive environment***; (3) the ***services are***
> ***provided in a coordinated and collaborative manner*** by the key
> `stakeholders'; and (4) ***positive academic and non-academic benefits are***
> ***demonstrated***.

> (emphasis added)

54.  The foregoing demonstrates that the IEP was not reasonably calculated, as it

    meets none of the above four factors.

<u>JR WAS DENIED FAPE IN THE TWO YEARS PRECEDING THE FILING OF THE
COMPLAINT BECAUSE IT KNEW JR REQUIRED "RELATED SERVICES" WHICH
GCSD DID NOT PROVIDE</u>

55. The Supreme Court in 2017 in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch.*

    *Dist. RE-1,* 137 S.Ct. 988, 993, 197 L.Ed.2d 335 (2017) emphasized the role of

    "related services."

> "A FAPE, as the Act defines it, includes both "special education" and
> "related services." § 1401(9). "Special education" is "specially designed

instruction ... to meet the unique needs of a child with a disability";
***"related services" are the support services "required to assist a child ... to
benefit from" that instruction***. §§ 1401(26), (29). A State covered by the
IDEA must provide a disabled child with such special education and ***related
services*** "in conformity with the [child's] individualized education
program," or IEP. § 1401(9)(D)."

(emphasis added)

56. The phrase "related services" is defined in IDEA regulations at <u>300.34 Related</u>

<u>Services</u> as follows:

"Related services means transportation and such developmental, corrective,
and other supportive services ***as are required to assist a child with a
disability to benefit from special education***, and includes ***speech-language
pathology*** and audiology services, interpreting services, psychological
services, ***physical and occupational therapy,*** recreation, including
therapeutic recreation, early identification and assessment of disabilities in
children, ***counseling services***, including rehabilitation counseling,
orientation and mobility services, and ***medical services for diagnostic or
evaluation purposes***. Related services also include school health services
and school nurse services, social work services in schools, and ***parent
counseling*** and training."

….

(2) Counseling services means services provided by qualified social
workers, psychologists, guidance counselors, or other qualified personnel.

….

(5) Medical services means services provided by a licensed physician to
determine a child's medically related disability that results in the child's
need for special education and related services.

(6) Occupational therapy—(i) Means services provided by a qualified
occupational therapist; and (ii) Includes— (A) Improving, developing, or
restoring functions impaired or lost through illness, injury, or deprivation;
(B) Improving ability to perform tasks for independent functioning if

functions are impaired or lost; and (C) Preventing, through early intervention, initial or further impairment or loss of function.

….

(8) (i) Parent counseling and training means assisting parents in understanding the special needs of their child; (ii) Providing parents with information about child development; and (iii) Helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP.

(9) Physical therapy means services provided by a qualified physical therapist.

(10) Psychological services includes—(i) Administering psychological and educational tests, and other assessment procedures; (ii) Interpreting assessment results; (iii) Obtaining, integrating, and interpreting information about child behavior and conditions relating to learning; (iv) Consulting with other staff members in planning school programs to meet the special educational needs of children as indicated by psychological tests, interviews, direct observation, and behavioral evaluations; (v) Planning and managing a program of psychological services, including psychological counseling for children and parents; and (vi) Assisting in developing positive behavioral intervention strategies.

….

(15) Speech-language pathology services includes—(i) Identification of children with speech or language impairments; (ii) Diagnosis and appraisal of specific speech or language impairments; (iii) Referral for medical or other professional attention necessary for the habilitation of speech or language impairments; (iv) Provision of speech and language services for the habilitation or prevention of communicative impairments; and (v) Counseling and guidance of parents, children, and teachers regarding speech and language impairments.

57. Like the federal IDEA regulations, the MDE *Procedures for State Board Policy*

*74.19* provide:

"***Related services*** are developmental services, corrective services, and other supported services required to ensure a child with a disability benefits from

special education. The IEP Committee *must review all of the evaluation information*, to i*dentify any related services* the child may need *and to include them in the IEP*.

(emphasis added)

58. The district was required to provide *all appropriate related services* it believed

necessary *before segregating JR from his peers*.  This is true whether those peers

would include the non-disabled in some general education environments (e.g., PE,

lunch, recreational activities at school) or whether those peers would be other

special education students in a "self-contained" classroom without any general

education students.

> *Because the law expresses a strong preference for children with disabilities to be educated, "to the maximum extent appropriate,"* together with their non-disabled peers, 20 U.S.C. § 1412(5), special education and *related services must be provided in the least restrictive setting consistent with a child's needs. Only "when the nature or severity" of a child's disability is such "that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" should a child be segregated*.
>
> *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.
>
> 1998)(emphasis added).

59. The district was aware of its obligation to provide related services before moving

JR to a more restrictive environment, as its supplemental answer demonstrated:

> "On October 5, 2017, the IEP committee met and determined that Joshua would receive special education and related services by attending 1/2 schools days instead of full days." (P.3 para. 9)(emphasis added)
>
> "After the behaviors continued, on October 25, 2017, the IEP committee met and determined that special education and *related services* in an

alternative setting, homebound, was the *least restrictive environment (LRE)* in which to provide Joshua a free and appropriate public education (FAPE). The committee determined that Joshua would receive *homebound services*, to include both special education and *related services*, at Rocky Creek Elementary School, Monday through Thursday, *for one hour each day*. Homebound services have been provided by a special education teacher."

(A-Rec., p.3 para. 9)(emphasis added)

60. The Hearing Officer's order recited issues of related services necessary to place JR

in the Least Restrictive Environment:

> *[6] Whether the child has been denied FAPE because he has been denied an appropriate BCBA evaluation, an appropriate BIP, and an RBT trained to fidelity to implement a BIP designed to include petitioner in an educational environment with his non-disabled peers to the maximum extent[?]*
>
> *[7] Whether the child should at all times be in the physical presence of and receive the assistance of a designated one-on-one paraprofessional who shall be trained by the BCBA, in order to maximize the LRE[?]*

61. Leah Wilkins was JR's special education teacher for two years, 2016-2017 and

2017-2018, with her teachership of JR ending in May 2018. (hereafter, "The

2016-2018 SPED Teacher) (A-Tran. 708:5)  She was also on the 2018-2019 IEP

team in May 2018. (A-Tran. 697:18) She was declared to be an adverse witness to

the student due to the attorney-client privilege claimed between her and the

district's counsel. (A-Tran. 691:13)  Her testimony and the supplemental answer

of the GCSD demonstrate that the GCSD failed to provide related services they

knew were required.

62. The 2016-2018 SPED Teacher had nothing but praise for JR before his behavior problems developed in October 2017: "I thought he was a poster kid for me. He was amazing. He was going -- when I first got him, he was going into the regular classroom and he was very independent and holding his own. And then last year he had some tendencies that happened that were, of course, aggression.  And so it's kind of been two years of trying to figure out what has changed in his life for him to change so drastically from what he was two years ago to now just being very aggressive. But I've had him for two years and we made decisions on him, as a team, from the very moment I've had him till now so I love JR very much.  He was wonderful." (A-Tran. 692:20)

63. The 2016-2018 SPED Teacher wrote no concerns about JR's parents. (A-Tran. 738:24-739:17)  Some special education students have parents who never contact her, but JR's parents did communicate with her. (A-Tran. 743:8-17) She  had a good working relationship with JR's mother and agreed that JR had been like a ship losing its anchor. (Q. And both of you were trying very hard to try to figure how to remoor him, reanchor him, right? A. Yes, sir.  Q. Okay.  And would you agree that both you and his mother genuinely did everything you could[?] A. Yes, sir." (A-Tran. 707:17)  It was not her opinion that JR's parents caused the deterioration of JR's behavior in 2017-2018. (A-Tran. 775:21) "I never said that, not at any time." (A-Tran. 775:21) "I have never said one time that I felt like it's

any one person's fault for JR's behavior.  I think it takes a team to help a child."

(A-Tran. 776:10)

64. The 2016-2018 SPED Teacher testified that before the October 2017 reduction to

one hour per day away from all disabled or non-disabled peers,  "JR was able to go

to lunch with his peers, recess with his peers, PE with his peers, specials with his

peers.  Anything that was not academically driven, we decided that, as a team, so

he could get the social interaction with children of his same age." (A-Tran.

695:15)  "JR loved being around children [other students]. . . He just wasn't able to

communicate in the way he wanted to." (A-Tran. 710:8-24)

65. The 2016-2018 SPED Teacher explained the importance of the "least restrictive

environment" in light of JR's interaction with other children, because "as he gets

older, he's going  to have to learn how to respond to different groups of people.  So

disability or not, we always want to incorporate children with their typical peers so

they can learn how to behave and how to be a part of society and JR enjoyed being

around others." (A-Tran. 711:18)(LRE)  She testified that in t;he 2016-2017

school year JR had "zero" aggressive behaviors. (A-Tran. 725:11), he was a happy

child who had a severe intellectual disability. (A-Tran. 712:14)

66. However, in March 2017, the 2016-2018 SPED Teacher wrote a report on JR

(A-Tran. 732:1; PEx 6, doc. 39) to inform the IEP team on her personal

observations of JR. (A-Tran. 733:16).  She wrote that JR knew classroom rules

and behavior expectations (A-Tran. 732:19), but that "JR does not understand

relationships with friends and socializing.  He usually is withdrawn and keeps to

himself." (A-Tran. 734:4)  She wrote that JR was "out of touch with reality,"

(A-Tran. 735:12)  The 2016-2018 SPED Teacher's March 2017 report also stated

that he was obsessive compulsive, which she explained related to his "obsessive

clapping and flapping" (A-Tran. 736:12), which he did when "excited to show his

emotions." (A-Tran. 737:10) The report further stated that JR "does not recall

what we learn from one day to the next." (A-Tran. 773:16)

67. The 2016-2018 SPED Teacher knew JR's IQ was 42 and that it placed him in the

"less than 1 percent," meaning he was as severely intellectually disabled as a child

can be. (A-Tran. 696:1) He would not be able to do word problems. (A-Tran.

695:9)  She knew that JR's IQ of 42 with an overlay of autism meant that he was

going to have severe behavioral issues. (A-Tran. 722:15)   She agreed  that JR has

intense emotions and is profoundly emotionally disabled. (A-Tran. 703:25)  JR

communicates in 3-4 word utterances "even though his language has continued to

expand." (A-Tran. 704:11) She explained JR "does not speak in conversational

speech," only in "carrier phrases" such as "I don't know" or "JR doesn't know."

(A-Tran. 704:23)

68. The 2016-2018 SPED Teacher's testimony demonstrated that the GCSD denied

FAPE by not providing "related services" required by IDEA.  She testified that she

wanted the parents to pay for private speech and occupational therapy, but she admitted that the law requires the school district to provide FAPE, not the parents. (A-Tran. 747:10) **She agreed it would have been "appropriate" for JR to have had more speech therapy "because language is his biggest deficit."** (A-Tran. 747:18-748:16). She believed as a member of the IEP team that JR needed additional speech therapy and that it would have **"definitely"** have been **"appropriate,"** but the IEP team did not provide it as a special education service. (A-Tran. 788:21-790:3)

69. The 2016-2018 SPED Teacher testified that the parents should have obtained other **resources other than from the district, such as a "medical workup."** (A-Tran. 748:17) She believed (as did the mother) that hormones were at play (A-Tran. 748:22) because JR was "getting close to being a teenager" (A-Tran. 749:8) She testified that JR was nearing puberty and that, because of testosterone and development into puberty, "one of her assumptions" was that puberty was "triggering his aggressive behavior." (A-Tran. 749:18) **She admitted it was true that if the IEP team considered a medical workup to be necessary to provide a free and appropriate education, the district had an obligation to do that.** (A-Tran. 764:11) But the GCSD did not arrange for a medical evaluation, she confirmed. (A-Tran. 787:23)(RS)

70. The 2016-2018 SPED Teacher believed "it would have been **appropriate for JR's parents to have received counseling**," (A-Tran. 774:6-25), to "help them to deal with what they have to deal with at home. It's not just about JR.  I mean, they have to deal with a lot, too, as parents to a child with a  disability." (A-Tran. 775:6) However, the GCSD did not provide it.

71. The 2016-2018 SPED Teacher testified that "a professor from the University of South Alabama" who "was an expert in autism" "had completely offered her services free and gave me her business card."  This professor was "an expert, she travels the world, she has a doctorate at USA," who could provide "strategies." (A-Tran. 778:14) The 2016-2018 SPED Teacher testified this expert "was just going to come freely and observe JR" and the expert was "very explicit and she would just give her services for free." (A-Tran. 779:10) The 2016-2018 SPED Teacher admitted that she knew that the district has an independent obligation to provide FAPE, (A-Tran. 779:24), and that if the district believes that an autism professional should be brought into the school to work with a child, that the IEP team can require that whether the parents want it or not." (A-Tran. 780:4) However, the IEP team did not enroll the services of this expert "to work with JR when his behavior started deteriorating" because JR was **"a lost cause at that point."** (A-Tran. 780:16).  **A child is not a "lost cause" under any circumstances under IDEA, and that is the very point of related services.**

72. The 2016-2018 SPED Teacher testified that ABA therapy was "good if it's done right" but agreed she was not qualified to testify as to what type of ABA therapy is appropriate. (A-Tran. 755:21-756:11)  Nor was she qualified to opine on what ABA therapy would be appropriate for JR's education. (A-Tran. 756:24)(RS)  She did not know why the IEP team did not bring in ABA services.

> *Q.   All right.  And do you agree that JR needs a one-to-one aide who is properly trained in  working with children with autism?*
>
> *A.   Yes.*
>
> Q.   All right.  And do you understand that that's called an RBT or registered behavioral technician?
>
> A.   I'm unaware.
>
> *Q.   Well, you do agree that to be qualified to work with a child with autism, the person has  to have training in behavioral characteristics and modification of behavior in children with autism?*
>
> *A.   Yes, sir.*
>
> *Q.   In the two years that you had JR in  your class, was there any one-to-one aide who had any training in working with children with autism?*
>
> *A.   We had a TA [Teacher's Assistant] in my room but I don't believe she was trained.*
>
> Q.    All right.  In the two years that you  had him?
>
> A.   Yes, sir.
>
> *Q.   All right.  And in the two years that you had JR in your class, 2016-17, 2017-18, did the district ever bring in any person referred to  as a BCBA?*

> **A.   No, sir.**

   (A-Tran. 785:15)(RS)

73. The 2016-2018 SPED Teacher had been on the May 2018 IEP team and recalled the parents' letter to the May 2018 IEP Team requesting the district to hire or contract with a certified BCBA, (A-Tran. 923:5-11).  The 2016-2018 SPED Teacher testified that ***the IEP team did not make a decision, rather, the IEP members from the school delegated that decision to the special education director*** (A-Tran. 923:5-17; 924:23; 940:5)("Q.   So in the end, the decision was solely [the SPED director's] as to whether or not there was  going to be a BCBA, right?  A.   That's how -- yes, sir.  That's how it was left.")

74. The IEP team made ***no decision on the parents' request for a 1:1 behavior aide trained by a BCBA, but instead, delegated that decision to the SPED director to make at a later time*** (A-Tran. 925:21)(A-Tran. 928:5)("We looked at it at the IEP meeting as far as the goals and things, but the SPED director, you  know, there is only so much we can say yes and no to.  So it was kind of left with [the SPED director]  to see what she could do for the parents.")   The 2016-2018 SPED Teacher could not explain why the district did not hire a BCBA to work with JR as a result of the May 2018 IEP meeting, and the 2016-2018 SPED Teacher ***could not explain why the IEP team did not decide to hire a BCBA to work with JR.*** (A-Tran. 933:8-17)(DELG)

75. The 2016-2018 SPED Teacher "knew that communication was probably the main

factor for his [JR's] aggression." (A-Tran. 959:3) Under questioning by the

Hearing Officer regarding whether the IEP Team disagreed with the private BCBA

work being done by the parents, The 2016-2018 SPED Teacher testified, "You

have to know how to execute it. You have to be trained very, very well in order to

understand this type of methodology. " (Questioning by IHO, 960:10-965:13)

Wilkins then testified:

> Q.   And at the same time, you've described  what a BCBA does is deep and
> complex and really not something that you or other members of the IEP
> team understood, right?
>
> A.   Yes, sir.
>
> Q.   And yet, the IEP team though it disagreed with the methodology of the
> parents' BCBA and didn't  understand the principles themselves because no
> members of the IEP team was a BCBA, the IEP team nonetheless declined
> to hire its own BCBA, true?
>
> A.   I'm unaware of what [the SPED Director for GCSD] has decided to do
> with the hiring of a BCBA. (A-Tran. 966:3)(DELG)

76. Sonya Dena Rogers testified as a school district psychometrist and positive

behavior intervention specialist. (A-Tran. 1830:22) Rogers testified JR needed

"intensive behavior therapy at this time," (A-Tran. 1889:10), that the district could

not provide FAPE, 1890), because ***"I don't know that we have the staffing and

the means to be able to do that at this point."*** (A-Tran. 1890:16) Rogers admitted

to the IHO that the district cannot provide a free and appropriate education to JR,

(A-Tran. 1893:11) because JR needed *"more one-on-one where they are working specifically with behavior."*(A-Tran. 1893:11)

77. On August 8, 2018, the district <u>filed its original answer answer</u>

78. The foregoing initial Answer of the district, on August 8, 2018, had *expressly acknowledged that the GCSD realized the need for ABA therapy and a BCBA for JR including "teacher professional development" from "Teachtown":*

> "The IEP committee researched and discussed the parents' request for the district to contract with a BCBA company and for an individual behavioral aid to be assigned to Joshua. *The district did make attempts* to get information regarding *contracting with two different companies for ABA therapy* including *the company that employs the BCBA and BCaBA therapists that his parents are working with to provide ABA therapy* to Joshua. *Since that was unable to be obtained the LEA began the process* of *contracting with a company* that provides *ABA therapy* through other mean [sic] and *went into a contract* with *Teachtown*, a computer programming *including teacher professional development* (*Teachtown*). The George County School District has *worked with [JR]'s BCaBA* to allow her to observe his behavior in the school setting. At that time she met with the Joshua's teachers and positive behavioral specialist to discuss her observations, data and input. Her information and input was considered and *used in developing his 18-19 IEP* and BIP including her presence in IEP meetings on 2-28-18, 4-25-18, 5-11-18 and 5-21-18. *The IEP committee considered the request for an individual behavior aid for Joshua, however they rejected the idea due to concerns of further restricting his environment and causing Joshua to develop a co-dependency of that individual.* However in response to the consideration of Joshua's parents' request for *an individual aid, an aid was moved from a different school* by the LEA and approved at the July 10, 2018 board meeting in order to provide George County Middle School with an additional aid in order to help service Joshua and other students as needed.

79. No teacher professional development was revealed in the testimony of any district educator. Rather, it is clear that Teach Town was not implemented. Dena Rogers,

who testified as the Positive Behavioral Intervention specialist, (A-Tran. 986:6)

for the district, stated that "we have access through Teach Town to [a] BCBA if

we have questions." (A-Tran. 1014:20) However, she admitted that Teachtown

was never even contacted:

> 5 Q. Can you name any of the BCBA's that
> 6 work at Teach Town?
> 7 A. Not off the top of my head, no.
> 8 Q. Do you know what city they are in?
> 9 A. No.
> 10 Q. Has one ever personally been here in
> 11 this District?
> 12 A. Not that I'm aware of.
> 13 Q. And I don't know if I asked you, have
> 14 you ever had a telephone conference with any of
> 15 them?
> 16 A. Not at this point.
>
> . . . .
>
> 9 Q. Okay. And have you spoken with anyone
> 10 at Teach Town about on-site training before
> 11 coming here?
> 12 A. That was not for me to do. That
> 13 was our director handles any of that type of
> 14 thing.
> 15 Q. Have you heard anyone say we should
> 16 pay for Teach Town to send a BCBA down here for
> 17 on-site training for our staff?
> 18 A. I don't recall that.
> 19 Q. But you're aware that they offer that
> 20 as a professional service?
> 21 A. Yes.
> 22 Q. And have you inquired on the cost of

23 that?

24 A. I have not.

25 Q. Do you know if anyone else has?

1 A. I do not.

2 Q. Have you read on the Teach Town

3 website, quote, classroom on-site coaching

4 "on-site coaching uses highly individualized and

5 hands on approach to supporting teachers in

6 their journey with Teach Town. Prior to each

7 teacher visit, Teach Town coaches, examines data

8 reports documented by individual teachers,

9 program usage of his or her student's progress

10 in the program." end quote. Have you read

11 materials like that?

12 A. Yes.

(A-Tran. 1015:5)

8 Q. Do you know whether -- do you know

9 why -- I think you said it's not your wheelhouse

10 or field of operation, but *do you know why the*

11 *District has not brought in a BCBA from Teach*

12 *Town to actually visit here at the District?*

13 *A. I do not. You are correct, that is*

14 *not in my job title or description. So I do not*

15 *know the answer to that.*

16 Q. Would that have been solely the

17 decision of Mrs. Dixon [the SPED Director] before she retired?

18 A. That would have been a school District

19 decision. I don't know that it would have been

20 necessarily her decision alone. It would have

21 been a school District decision that I would

22 assume the superintendent and school board would

23 have been involved in.

24 *Q. Are you aware that Teach Town has a 40*

25 *hour program to provide online training for the*

*1 RBT list?*

*2 A. Yes.*

*3 Q. And that's a Registered Behavioral*

*4 Technician?*

*5 A. Yes.*

*6 Q. And you understand that a Registered*

*7 Behavioral Technician has 40 hours of training*

*8 to work specifically with a child with autism?*

*9 A. Yes.*

*10 Q. And do you know if the District has*

*11 if any of the District employees have had the 40*

*12 hours of registered technician training?*

*13 A. Not to my knowledge.*

14 Q. And was Teach Town discussed at the

15 IEP meeting in May of 2018?

16 A. No, sir. Not that I remember. I'm

17 going to say I can't answer that because I don't

18 remember if it was discussed at that point.

*19 Q. Have you determined from your --*

*20 becoming familiar with the Teach Town web based*

*21 services that it cost $999 per student to train*

*22 an RBT?*

*23 A. Yes.*

*24 Q. And that's to become certified?*

*25 A. Yes, sir.*

1 Q. Do you know who other than yourself

2 has been investigating the use of Teach Town as

3 a means of providing an appropriate education to

4 JR?

*5 A. I know that before her retirement Mrs.*

*6 Dixon [the SPED Director] had me to contact Teach Town to look into*

*7 the RBT training and get a quote from them for*

*8 the training for Mr. Miller. And that quote was*

*9 then forwarded to, I believe, Mrs. Tushard*

*10 (phonetic) the superintendent of education for*

> *11 approval.*
> *12 Q. Did he receive that training?*
> *13 A. I don't know that that has been*
> *14 approved.* You would have to check with the
> 15 District office to see if that was approved.
> *16 Q. Has it been your observation reviewing*
> *17 the Teach Town materials that it appears to be*
> *18 an organization that provides BCBA services, RBT*
> *19 services to school districts so that they can*
> *20 appropriately educate children with autism?*
> *21 A. Yes.*

(A-Tran. 1020:8)

80. The 2016-2018 SPED Teacher testified that ***the IEP team did not make a***

***decision***, rather, the IEP members from the school delegated that decision to

Dixon, the SPED Director. (A-Tran. 923:5-17; 924:23; 940:5).

> Q.   Okay.  And what was the next one, number four that the parents
> requested at the IEP team meeting?
>
> A.   Do you want me to read it?
>
> Q.   Please.
>
> A.   School District ***will hire or contract with a certified BCBA.***
>
> Q.   And what discussion do you recall about the IEP team about the need
> for that?
>
> A.   I recall Mrs. Donna Dixon [The SPED Director] saying she would look
> into that for the parents.  But there was no  decision made on that during the
> meeting time.
>
> (A-Tran. 923:5-17)

Q.   And the -- what was -- what decision  what do you remember about anyone on the IEP team meeting team -- anyone on the IEP team other than the parents -- because they wanted a BCBA -- anybody on the IEP team who was there from  the District, did anyone say yes, we should get a BCBA, the District should hire one?

A.   If I can recall correctly, I just remember Mrs. Donna Dixon [the SPED Director] say that she would look into the BCBA and that she had several things that she was trying to work on and that she would get back to  her. That's as much as I can recall.  There wasn't a yes or a no from what I can recall.

(A-Tran. 924:23)

. . .

Q.   Mrs. Dixon [the SPED Director]  said, I'll just have to go  back to see what I can do?

A.   Yes, sir.

Q.   So you, *as an IEP team member, you didn't know if one was going to be hired or not.* You were  waiting for Mrs. Dixon [the SPED Director]  to decide?

A.   Yes, sir.

Q.   So in the end, *the decision was solely* Mrs. Dixon's  [the SPED Director] as to whether or not there was  going to be a BCBA, right?

A.   That's how -- *yes, sir.*  That's how it was left.

(A-Tran. 940:5)

81.  Likewise, the IEP team made no decision on the parents' request for a *1:1 behavior aide trained by a BCBA*, but instead, delegated that decision to Dixon [the SPED Director] to make at a later time (A-Tran. 925:21). "We looked at it at

the IEP meeting as far as the goals and things, but the SPED director, you  know, there is only so much we can say yes and no to.  So it was kind of left with Mrs. Donna Dixon [the SPED Director]  to see what she could do for the parents." (A-Tran. 928:5)  The 2016-2018 SPED Teacher *could not explain why the district did not hire a BCBA to work with JR as a result of the May 2018 IEP meeting*, and the 2016-2018 SPED Teacher *could not explain why the IEP team did not decide to hire a BCBA to work with JR.* (A-Tran. 933:8-17)

82. The GCSD violated IDEA and denied FAPE by not providing related services it knew were needed for JR's special education before changing his placement to homebound. Further, the Hearing Officer committed error by ordering placement at non-district school without ordering that related services be implemented to maintain placement at the GCSD.  In addition, the Hearing Officer incorrectly concluded that he had no authority to make a change of placement. "If the hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of paragraph (a) of this section." Sec. 300.518

THE MAY 2018 IEP MEETING, WHICH RESULTED IN THE IEP FOR THE
SCHOOL YEAR 2018-2019, ALSO DENIED FAPE TO JR

83. JR was also denied FAPE in May 2018 when the GCSD IEP Team wrote his IEP for the school year 2018-2019.  This 2018-2019 IEP was written within the two years preceding the filing of the due process complaint in August 2018.

84. Tyler Miller ("The 2018-2019 SPED Teacher") was JR's 1:1 special education teacher for JR's single hour per day, four days a week, when the 2018-2019 school year began in August 2018.  He had an undergraduate degree in accounting, with no courses taken in undergrad in special education. (A-Tran. 802:4)  His Masters was in the general art of teaching. (A-Tran. 802:7)

85. The 2018-2019 SPED Teacher had been a member of the IEP team in May 2018. The May 2018 IEP team had written a behavior goal that stated:"JR has shown improvement in his aggression toward others but he needs to be able to continue [to] increase in his language skills in order to express himself through circles of communication.  JR  needs to be able to engage in appropriate cooperative social play. Interactions are initiated by teachers and peers." (A-Tran. 827:21)  When asked, "how was it that [JR] was going to engage in appropriate cooperative social play, interactions initiated by peers" when he was completely isolated from his peers, the 2018-2019 SPED Teacher replied, "I don't recall that being discussed." (A-Tran. 827:3)(LRE)

86. The 2018-2019 SPED Teacher did not know the basis for the IEP team deciding that 1 hour per day of school, 4 days a week, was an appropriate education for JR,

as opposed to him attending school 8 hours a day like other children do. (A-Tran. 832:2; 837:4)  "I signed that I was in attendance [at the IEP meeting] but I was told by my principal -- by my principal and my supervisors that I would be educating him one hour a day." (A-Tran. 837:18)(LRE) He did not recall any consideration by the IEP team of a less restrictive placement than homebound for JR. (A-Tran. 844:19-846:9)  He had no memory of the IEP teams considering educating JR for more than 1 hour per day, four days a week. (A-Tran. 848:2)

87. The 2018-2019 SPED Teacher had no memory of the IEP team discussing  what support, equipment, personnel, professional development the teacher might require to provide the appropriate accommodations and modifications, such that JR could be in a less restrictive environment. (A-Tran. 848:22)  He was not familiar with "supplementary aids and services." (A-Tran. 849:8)

88. The 2018-2019 SPED Teacher had no input at the May 2018 IEP meeting for the coming school year of 2018-2019.  (A-Tran. 850:9)  He did not know why the IEP team decided that Extended School Year Services (ESY) were not needed for FAPE to be provided to JR. (A-Tran. 849:13)

89. The 2018-2019 SPED Teacher had never seen the May 11, 2018 letter the parents presented to the IEP team for its May 11, 2018 meeting.  (A-Tran. 838:11; PEx 6 doc. 84, 85)(A-Tran. 838:3) He did not even consider "as an IEP team member, the parents' request for a one-to-one behavior aide trained in Fidelity in the ABA

services by a BCBA or BCABA." (A-Tran. 838:10)  Taken through the list of the

parents concerns presented to the May 2018 IEP team in a letter, he admitted ***he***

***had considered none of the parents' concerns***.[7] (A-Tran. 839:17-840:10)

90. The 2018-2019 SPED Teacher had never read the psychometrist report of Kim

Davis in JR's special education file, even though he had been a member of the

May 2018 IEP team.  (A-Tran. 816:23)

91. The 2018-2019 SPED Teacher did not know why the IEP team did not decide to

hire a BCBA. (A-Tran. 841:21)(RS) He was asked why the IEP team had not

provided JR with a full day of school when it met on May 21, 2018, and he stated

"that would be a question for the SPED case worker that prepared his -- she would

be better able to explain her line of thinking," and that "case worker" was the

2016-2018 SPED Teacher from the two prior school years. (A-Tran. 812:11)

92. Once he began trying to teach JR in August 2018, the 2018-2019 SPED Teacher

used a computer program to try to teach JR, but the 2018-2019 SPED Teacher had

never determined whether that program is appropriate for JR, and it has no user

manual. (A-Tran. 822:5)  It does not ask for the child's IQ to be entered. (A-Tran.

822:24) The 2018-2019 SPED Teacher could not identify any reliable authority he

had ever read about autism. (A-Tran. 864:15)

---

[7] There is no dispute that the letter was before the May 11, 2018 IEP team: it was stamped
received and attached to the district's response to the due process complaint. (A-Tran. 843:2)

93. JR had already been suspended for 9 days by the date of the 2018-2019 SPED

Teachers testimony on October 24, 2018. (A-Tran. 815:8) The 2018-2019 SPED

Teacher testified he did not feel "adequate" to address JR's behaviors and that

JR's behaviors needed to be "addressed by an expert" so JR would be able to

receive FAPE from the district (A-Tran. 825:5)(RS)

> Q.   So do you testify here, under oath,  that you are qualified, given his IQ
> of 42, given his autism, to determine appropriate academic  goals for him?
>
> A.   Given JR's aggression, his aggression, I felt like his aggression and off
> task behaviors were one of the main barriers to us educating him, and I did
> not feel adequate to address those behaviors. My -- I thought that ***those
> behaviors  needed to be addressed by an expert and then JR would be
> better able to receive FAPE by George County schools.***
>
> (A-Tran. 825:5)(emphasis added)

94. The 2018-2019 SPED Teacher was shown P-Ex 24 in the administrative record,

the photo of JR in The 2018-2019 SPED Teacher 1 hour per day class.  (A-Tran.

854:13) The 2018-2019 SPED Teacher said JR was sitting with his backpack still

on because "he likes to sit there with his backpack on." (A-Tran. 854:19) He also

testified "JR does not want to be at school and so he is performing some of the

behaviors to escape, to escape a task, or to escape school." (A-Tran. 853:19)  He

repeatedly agreed he was not qualified to express any opinion that the parents were

causing JR's deterioration of behavior at school, as opposed to his autism, IQ of

42, and going through puberty. (A-Tran. 858:13; 860:4; 860:16)

95. The 2018-2019 SPED Teacher testified: "[S]ometimes he acts as if he does not

    know what is going on." (A-Tran. 865:8)  He was read a portion from the

    psychometrist's stating that JR was "easily confused, has  repetitive behaviors, is

    sometimes withdrawn, is unable to comprehend after reading, needs full attention

    one-on-one to complete work task." The 2018-2019 SPED Teacher agreed it was

    "a good summary" and "would apply to JR," and was consistent with his

    observations of JR. (A-Tran. 863:6)  He testified that HE cannot remember "days

    of the week.  We can talk about it -- we can talk about today is -- today is

    Wednesday, tomorrow is Thursday, and come back the next day and him not recall

    us having said  anything about the next day being Thursday." (A-Tran. 866:9)

96. The 2018-2019 SPED Teacher **believed that JR can learn,** and explained, "JR has

    been potty trained and can communicate with you when  he needs to go to the

    restroom. So that makes me think that other behaviors he can learn and learn

    adaptive behaviors." (A-Tran. 868:20)  The 2018-2019 SPED Teacher was asked

    what was "actually practiced in behavior intervention with JR in the one hour that

    you receive him each day," (A-Tran. 886:2), for instance, regarding JR "slapping

    at someone or slapping at someone." (A-Tran. 886:15) He testified **there was no**

    **Behavior Intervention Plan on that subject**, but his response to JR was to instruct

    him about "keeping your hands to yourself." (A-Tran. 886:15)

Q.  Okay.  When he has been flapping or  attempting to hit, has there been any approach that you have been able to teach him to increase an alternative behavior other than slapping or flapping at you or someone else?

A.   I can't recall at this time. (A-Tran. 889:17)

97. The 2018-2019 SPED Teacher had a "teacher's assistant" working with him for the single hour per day. When school resumed in August 2018, John Morgan ("The Teacher's Assistant") acted as teacher's assistant under the 2018-2019 IEP, not a paraprofessional. (A-Tran. 469:22)   The Teacher's Assistant had no training in special education (A-Tran. 471:5), had never taken a course in special education (A-Tran. 471:11).

98. The Teacher's Assistant described JR as a "very small child." (A-Tran. 495:3) When the Teacher's Assistant was told he would work with JR, "[t]hey told me that he was known to hit.  So I needed to be watchful for that." (A-Tran. 501:4) *The Teacher's Assistant was never shown or given the child's behavior intervention plan or BIP.* (A-Tran. 489:12). The Teacher's Assistant was given no training at all on autism. (A-Tran. 502:2)

99. For the four hours per week in the beginning of the 2018-2019 school year, the Teacher's Assistant would interact with JR "a little bit" "saying hello, how are you?" (A-Tran. 489:17)  But he provided no instruction. (A-Tran. 489:24)   The Teacher's Assistant agreed it was him in a photograph, , leaning against the wall, standing 10 to 15 feet from JR. (A-Rec., P-Ex 21)(A-Tran. 481:17, 481:7, 483:20)

64

In the photograph taken by the GCSD, JR is sitting in a chair with his backpack still on. (A-Tran. 483:21)(A-Tran. 484:3). The Teacher's Assistant **did not recall if JR was ever allowed to take off his backpack as he sat there for his one hour.** (A-Tran. 484:21) JR was not in a classroom but a room where "they keep a lot of books in there," (A-Tran. 485:15), with "a machine of some kind" that no one used. (A-Tran. 486:4) There was another person in the photo beside the JR but The Teacher's Assistant did not know who the person was. (A-Tran. 486:12) The Teacher's Assistant never had to restrain JR, and he never saw a teacher restrain JR. (A-Tran. 491:15) The Teacher's Assistant's job was to fill out a tally sheet of how many times JR engaged in aggression attempts. (A-Tran. 492:12) He was not recording appropriate replacement behaviors, and he did not know what that term meant. (A-Tran. 492:10) The Teacher's Assistant had written a memo (A-Rec. P-Ex 30)(A-Tran. 494:20) about JR tipping and shoving a table 27 times toward the special education teacher. (A-Tran. 495:13) The Teacher's Assistant stated he was "not qualified" to know if JR with an IQ of 42 could mentally process the word "stop." (A-Tran. 497:15)

100.   The district court's review considers the four factors set out in *Houston Independent School v. VP Ex Rel. Juan P.*, 582 F. 3d 576, 583 (5th Cir. 2009):

> We have set out four factors that serve as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," and these factors are whether  (1) the program is **individualized** on

the basis of the student's assessment and performance; (2) the program is ***administered in the least restrictive environment***; (3) the ***services are provided in a coordinated and collaborative manner*** by the key `stakeholders'; and (4) ***positive academic and non-academic benefits are demonstrated***.

101.    The foregoing demonstrates that the 2018-2019 IEP was not reasonably

calculated, as it meets none of the above four factors.


*/s/ Henry L. ("Max") Cassady, Jr.*
*Mississippi Bar ID 105777*
_____
Henry L. ("Max") Cassady, Jr.
Cassady & Cassady, PC
23710 US Hwy 98, Ste D
Fairhope, Alabama 36532
251-207-7000
maxcassady@gmail.com