IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**KIMBERLY REYNOLDS, PARENT
AND NEXT BEST FRIEND OF J.R.,**
*a minor*                                                                            PLAINTIFF

**v.**                                                    CIVIL ACTION NO. 1:19-cv-426-TBM-RPM

**GEORGE    COUNTY    SCHOOL
DISTRICT**                                                                           DEFENDANT

**MEMORANDUM OPINION AND ORDER**

     Kimberly Reynolds brings this action under the Individuals with Disabilities Act on behalf

of her minor son J.R against the George County School District. J.R. has severe autism with an IQ

of 42, and his mother contends that an independent hearing officer erred when it found that the

District provided J.R. with a "free appropriate public education" (FAPE) under this law.

Specifically, Reynolds alleges that the District deprived J.R. of a FAPE during the 2016-17 and

2017-18 school years when it responded to his negative behavior by removing him from a standard

classroom and eventually reducing his time in a school setting to one hour per day for four days a

week. Though Reynolds initially sought substantive relief for J.R., she now only seeks attorneys

fees.

     While it is not the function of this Court to insert its views for those of the District, the

Court finds that J.R. was denied a FAPE from the period of October 25, 2017—when physical

education was eliminated from J.R.'s curriculum—until the filing of Reynolds' due process

complaint. Furthermore, at some point after J.R.'s school week was reduced to one hour per day

for four days a week and J.R. was confined to the assistant principal's office for the duration of his

school time, the District was not providing J.R. a FAPE academically either. The Court is not

required, nor able, to determine the exact point at which the District was no longer providing a FAPE from an academic standpoint.

## I. LEGAL AND FACTUAL BACKGROUND

J.R. is now roughly sixteen years old but was between eleven and thirteen years old during the 2016-17 and 2017-18 school years. During those school years he was a student in the District. [8-4] at 312. Under the policies required by the Individuals with Disabilities Act ("the Act"), 20 U.S.C. § 1400, the District recognized that J.R was autistic with intellectual disabilities and thus qualified for special education services. [8-4] at 312.

### A. The Act's Framework

The Act "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 137 S. Ct. 743, 748, 197 L. Ed. 2d 46 (2017) (quoting 20 U.S.C. § 1412(a)(1)(A)). "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 137 S. Ct. at 748-49 (quoting 20 U.S.C. §§ 1401(9), (26), (29)). "An eligible child, as [the Supreme Court] has explained, acquires a 'substantive right' to such an education once a State accepts the [Act's] financial assistance." *Id.* at 749. (quoting *Smith v. Robinson*, 468 U.S. 992, 1010, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984)).

In short, states and schools receive federal funds and the benefit of the bargain for the public is a guarantee that a free, quality education will be provided by state-sponsored entities. The Act ensures that children with disabilities have available to them a "[FAPE] that emphasizes special

education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" *Keith G. ex rel. C.G. v. Waller Indep. Sch. Dist.*, 697 F. App'x 816, 818 (5th Cir. 2017) (quoting 20 U.S.C. § 1400(d)(1)(A)). The Act places a premium on the local, collaborative efforts of professionals and parents in addressing the needs of a disabled child. *See R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010). Additionally, a school district is required to: (1) provide a FAPE to each disabled child within its boundaries, and (2) ensure that the FAPE is offered, to the greatest extent possible, in the least restrictive environment consistent with the student's needs. *Cypress Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997); 20 U.S.C. § 1412(a)(1), (5).

The FAPE provided must be developed to each disabled student's needs through an "individualized program of education" in the form of an individualized education plan. *Renee J. v. Hous. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 683 (S.D. Tex. 2017) (*Renee J. I*) (quoting *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017)). These plans are "written statement[s] prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *Michael F.*, 118 F.3d at 247 (citing 20 U.S.C. § 1401(20)). "The [plan] must be 'reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *Woody*, 865 F.3d at 309 (quoting *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017)). "[T]oward that end, the [plan] must be 'appropriately ambitious,' and [t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *E.R. ex rel. E.R. v. Spring Branch*

*Indep. Sch. Dist.*, 909 F.3d 754, 765 (5th Cir. 2018) (*E.R. I*) (quoting *Endrew F.,* 137 S. Ct. at 999-1000) (citations omitted).

The Act does not require that the plan "be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Michael F.* 118 F.3d at 247-48 (citing *Bd. of Edu. of Hendrick Hudson Cent. Sch. Dist. Westchester Cty. v. Rowley*, 458 U.S. 176, 188-89, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)); *see Endrew F.*, 137 S. Ct. at 999 (stating that a plan must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."). Still, the educational benefit which the Act contemplates, and to which a plan must be geared, cannot be "a mere modicum or de minimus" benefit. *Michael F.*, 118 F.3d at 248 (citations omitted). Instead, the plan must be "likely to produce progress, not regression or trivial educational advancement." *Id.*

When parents and educators do not agree about what a child's individualized education plan should contain, parents may turn to dispute resolution procedures established by the Act. *Endrew F.*, 137 S. Ct. at 994. "The parties may resolve their differences informally, through a '[p]reliminary meeting,' or, somewhat more formally, through mediation." *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(B)(i)). "If these measures fail to produce accord, the parties may proceed to what the Act calls a 'due process hearing' before a state or local educational agency." *Id.* (quoting 20 U.S.C. §§ 1415 (f)(1)(A), (g)). "The hearing is generally limited to the identification, evaluation, or educational placement of the child, or to determining whether the child received a FAPE." *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012) (citing 20 U.S.C. § 1415(f)(3)(E)(i)).

Finally, "at the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1415 (i)(2)(A)). "When a parent challenges the appropriateness of [a plan] a reviewing court's inquiry is twofold." *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009). The court must consider (1) whether the district complied with the procedural requirements of the Act; and (2) whether "the [plan] developed through such procedures was 'reasonably calculated to enable the child to receive educational benefits.'" *Juan P.*, 582 F.3d at 583 (quoting *Rowley*, 458 U.S. at 206-07). Under the Act, a district court may grant such relief as it deems appropriate. *Michael Z*, 580 F.3d at 292 (quoting 20 U.S.C. §§ 1415 (i)(2)(B)(iii))).

While Reynolds raised procedural challenges before the hearing officer, she has not alleged any on appeal; therefore she has forfeited these claims. *See Douglas W. ex rel. Jason D.W. v. Hous. Indep. Sch. Dist.*, 158 F.3d 205, 210 n.4 (5th Cir. 1998).

## B. The *Michael F.* Factors and the Act's Substantive Requirements

"To meet its substantive obligation under [the Act], a school must offer [a plan] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. The Act "contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Endrew F.*, 137 S. Ct. at 999 (internal citations omitted). "Any review of [a plan] must appreciate that the question is whether the [plan] is reasonable, not whether the court regards it as ideal." *Id*.

The Supreme Court has not adopted a bright-line standard for determining what "appropriate" progress looks like from case to case. *Id*. at 1001. But the Fifth Circuit has identified

5

four factors to use to determine if a child was denied a FAPE. *See Michael F.*, 118 F.3d at 253. Under this four-factor test, the district court considers: (1) whether the program was individualized on the basis of the student's assessment and performance; (2) whether the program was administered in the least restrictive environment; (3) whether the services were provided in a coordinated and collaborative manner by key stakeholders; and (4) whether positive academic and non-academic benefits were demonstrated. *Michael F.*, 118 F.3d at 253. The Fifth Circuit has "not held that district courts must apply the four factors in any particular way," but only "that these factors are 'indicators' of a[ plan]'s appropriateness, intended to guide a district court in the fact-intensive inquiry of evaluating whether [a plan] provided an educational benefit." *Michael Z.*, 580 F.3d at 294. However, the Fifth Circuit has long held that the fourth factor is critical. *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 529 (5th Cir. 2019) (*Renee J. II*) (citing *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813-14 (5th Cir. 2012)).

## C. J.R.'s Education

J.R. attended prekindergarten at L.C. Hatcher Elementary School and kindergarten through third grade at Rocky Creek Elementary School, both in the District. Throughout this time, J.R. always had an individualized education plan as required by the Act and received special education and related services for autism. J.R.'s mother also voluntarily transported him. [8-4] at 574. J.R. spent much of his time in a regular education classroom and went to a self-contained classroom for certain academic subjects. [8-5] at 395. But J.R. was re-evaluated during the 2016-17 school year after his special education teacher observed that he was doing kindergarten level work in a third-grade class. At that time J.R. was roughly eleven years old.

On March 8, 2017, the District's Individualized Education Plan Committee met to review the results of J.R.'s re-evaluation and testing by a Mississippi Department of Education certified psychometrist. J.R. was reclassified as having multiple disabilities, with autism and intellectual disabilities recognized as subcategories. [8-9] at 58-61; [8-13] at 478-88. The re-evaluation also disclosed the extent of his disabilities, including an I.Q. of 42. The Committee determined that J.R. would benefit from a self-contained classroom rather than a regular classroom. According to the District, self-contained classrooms are "for children who are significantly cognitively disabled." [8-5] at 377. But J.R. continued to go to lunch, recess, and special subjects—like physical education—with his peers. *Id.* Finally, on April 7, 2017, J.R.'s grade level was changed from third grade to fifth grade to reflect his age due to testing requirements. [8-7] at 572.

During the 2014-15, 2015-16, and 2016-17 school years J.R. attended school for the full day and did not exhibit any significant behavioral issues at school. But on September 21, 2017, J.R. slapped a teacher's hand twice, slapped a teacher's assistant in the chest, and kicked the teacher's assistant twice in the leg. [8-9] at 241. Dena Rogers, the District's psychometrist and positive behavior intervention specialist, was contacted to observe J.R. She conducted a functional behavior assessment and developed a behavior intervention plan for him. Leah Wilkins, J.R.'s teacher, began tracking J.R.'s violent and aggressive behaviors which he continued to display after the incident on September 21st. [8-9] at 241-248. These behaviors included hitting, slapping, and kicking teachers, teaching assistants, fellow students, and bus drivers. J.R. also hit himself and his parents when they brought him to school or helped him on to the bus. *Id.*

On October 5, 2017, the Committee held a meeting to review J.R.'s functional behavior assessment and J.R.'s behavior intervention plan. [8-13] at 135. J.R.'s special education teacher,

general education teacher, the principal, the counselor, the district psychometrist, and Reynolds all attended this meeting. The meeting led to developing a new behavior intervention plan to assist J.R. in managing his behavior, adding a behavior goal to J.R.'s individualized education plan, and changing J.R. from a full day of school to a half a day of school. The rationale behind the change to half days was reducing the stress of a full day on J.R. *Id.* at 136; [8-6] at 546. J.R.'s individualized education plan was also amended to allow J.R. to see the counselor twice a week. [8-7] at 516. Reynolds signed an amendment form, indicating her agreement with the changes. *Id.*

Despite the change to half-days, J.R.'s violent and aggressive behavior continued. Wilkins responded with several redirection techniques such as cool-down time, trampoline, cushion seats, bouncy balls, balance boards, outdoor swing, sensory objects, theraputty, glitter bottles, kindle, and computer time. [8-6] at 535-537; [8-4] at 223. According to Wilkins, there was "constant redirection, constant movement in the room to make sure everyone was safe," and while J.R. continued to receive his academics, Wilkins' focus was to keep him from hitting. [8-6] at 552. During this time, Wilkins saw J.R. punch a student with Down Syndrome and a student with autism in the head while they were sitting at their computers. *Id.* at 561. Wilkins also documented J.R. charging and acting uncontrollably, including attacking a teacher's assistant and the principal. *Id.* at 567.

On October 25, 2017, after several incidents where J.R. displayed aggressive and violent behavior towards teachers, staff members, and students, another review was held. The Committee determined that J.R.'s behavior was a manifestation of his disability and that the escalation of aggressive behaviors was due to the stress he felt at school. As a result, J.R.'s school hours were reduced further from half days to one hour per day, four days a week. Again, this was with the goal

of reducing the stressors that may have been triggering J.R.'s negative behaviors. [8-6] at 577. Wilkins stated that this change was temporary and that the goal was to "continually move that time up to get him back into the classroom." *Id.* Initially J.R. would attend school Monday through Thursday for one hour per day.

Under this new format, J.R. received three hours of academic services, 30 minutes of occupational therapy, and 30 minutes of speech services per week. The District made an ongoing diary of J.R.'s progress entitled "Impact of Disability and Student Needs." It noted that

> [J.R.'s] behaviors continue to escalate in a violent and aggressive nature that may cause harm to himself and others. [J.R.] exhibits different negative behaviors daily. [J.R.] exhibits the following behaviors: kicking, charging, pulling hair, punching, head butting, slapping, and now trying to pick objects up to throw. The [Committee] has decided it is best at this time for [J.R.] to receive home bound services here at RCES Monday through Thursday from 9-10 in order to receive his academics from a special education teacher and helper and to receive his related services until his negative behaviors are minimized and he no longer exhibits such violent and aggressive behavior. Due to [J.R.'s] modified schedule he will also discontinue the following [individualized education plan] goals until his violent behavior is minimized: identifying inches, identifying one to one correspondence, and identifying ones, fives, tens, twenties, and dollar bills. Once [J.R.'s] negative behaviors are minimized [J.R.'s] annual goal will be continued. If and when [J.R.'s] violent and aggressive behaviors tend to decrease the [Committee] will meet again to increase his academic time here at RCES.

[8-7] at 525.

In December of 2017, J.R.'s parents began privately contracting with Emily Tisdale, who provided J.R. with behavior therapy outside of home and school two times a week. J.R. continued to receive services during the 2017-18 school year and in March of 2018, Reynolds declined the District's offer of additional counseling support for J.R. The District continued to track J.R.'s behavior and J.R.'s aggression persisted. On one occasion he attempted to hit his occupational therapist 58 times in a thirty minute session. [8-4] at 205-209.

On May 11, 2018, the annual Committee meeting was held to develop J.R.'s individualized education plan for the 2018-19 school year. In addition to discussing J.R.'s accommodations and goals in multiple areas, the Committee discussed increasing the amount of time J.R. spent in a school setting. The Committee ultimately decided to continue the current plan and limit J.R.'s time in school to one hour per day for four days a week and to deliver his education in an administrator's office. The Committee noted that J.R.'s plan would be reviewed every 4.5 weeks to determine whether J.R.'s behavior would allow transitioning back into a self-contained classroom. [8-4] at 112-138. Additionally, the decision was made to transition J.R. to George County Middle School for the 2018-19 school year based on his age. [8-9] at 44. J.R.'s parents made numerous requests of the District. These included returning J.R. to a full day of school, increasing J.R.'s speech and occupational therapy, contracting with or hiring a board-certified behavior analyst, and hiring an individual aid. *Id.* at 145. None of these requests were granted and J.R.'s parents refused to sign his 2018-19 individualized education plan.

J.R. attended George County Middle School at the beginning of the 2018-19 school year and Tyler Miller, J.R.'s one-to-one teacher's assistant, continued to track J.R.'s behavior. Miller used various techniques to educate J.R. and used supplementary aids and manipulatives for teaching. Additionally, the District purchased and implemented applied behavior analysis therapy through the TeachTown program, with plans of training one of its teacher assistants as a registered behavior technician. [8-7] at 326-327. But J.R.'s aggressive and violent behavior escalated. On September 21, 2018, J.R. attempted to turn a table over on Miller, causing Miller to strain his back. In the light of his ongoing behavior problem, J.R. was suspended for nine days over the course of

August and September 2018. After the last suspension, J.R.'s parents did not return him to school for the remainder of the 2018-19 school year.

### D. The Due Process Hearing

On August 6, 2018, the first day of the 2018-19 school year, Reynolds submitted a due process request. She alleged that the District had violated both substantive and procedural mandates of the Act, including failing to provide J.R. with a FAPE. [8-4] at 1-12. Specifically, Reynolds alleged that (1) J.R.'s individualized education plan had not been implemented over the 2016-17 and 2017-18 school years, (2) that the District had denied J.R. transportation, (3) that the District had denied J.R. an appropriate board certified behavior analysis, an appropriate behavior intervention plan, and a registered behavior technician trained to faithfully implement a behavior intervention plan, (4)  that J.R. had been denied the opportunity to participate in nonacademic and extracurricular activities with his nondisabled peers, and (5) that J.R. had been denied a specially designed physical education. *Id*. at 4-9.

Reynolds requested an order awarding J.R. "compensatory education in the number of hours he has been denied [a] FAP[E], in the form of summer programs at the conclusion of the 2019 Spring Semester[,]" *id*. at 4, and "compensatory physical education in the number of hours he has been denied [a] FAPE[,]" *id*. at 10. Additionally, she made several specific demands with regard to the assignment of a registered behavior technician and specific tasks to be accomplished by the registered behavior technician. *Id*. at 5-6. Finally, Reynolds sought an order requiring an assessment of J.R.'s transportation needs by an occupational therapist and that Reynolds be reimbursed for prior transportation costs. *Id*. at 4-5.

11

On August 20, 2018, the parties participated in a resolution process, but were unable to resolve their dispute. [8-4] at 298. Subsequently, a hearing officer was assigned by the Mississippi Department of Education to preside over an administrative due process hearing. The hearing officer conducted a due process hearing over a period of 14 days, beginning on September 19, 2018, and ending on January 31, 2019.

After considering testimony from 14 witnesses and thousands of pages of exhibits, the hearing officer rejected Reynolds' claims. In a decision issued on May 3, 2019, the hearing officer found that the District had not violated the procedural and substantive requirements of the Act and that as a result the District had not denied J.R. a FAPE.

### E. Reynolds' Appeal

On August 1, 2019, Reynolds filed this appeal. [1]. As noted above, she challenged the hearing officer's decision and argued that the District violated the Act by denying J.R. a FAPE during the 2016-17 and 2017-18 school years. *Id.* at 3-4. Specifically, Reynolds argued that J.R. was denied a FAPE after his time at school was reduced to one hour per day, four days per week, on October 25, 2017, and that "he received no physical education of any kind." *Id.* at 18-20. Additionally, she argued that J.R.'s individualized education plans were deficient and not reasonably calculated to provide a meaningful educational benefit. Reynolds also requested an award of attorney's fees based on her position that "JR prevailed below in securing an administrative order that the school should provide [a] FAPE after denying him even a pretext of [a] FAPE during the school year 2018-2019." *Id.* at 4.

After this appeal was filed, the case was reassigned from different district court judges until it was eventually assigned to the undersigned. [20]. Reynolds had previously filed a memorandum

brief seeking independent review of the hearing officer's decision. *Id*. However, Reynolds did not technically have a motion pending that would trigger automatic motion review. *Id*. A docket review discerned the distinction, and a hearing was set on the merits of the memorandum brief. *Id*. After the hearing, the parties engaged in a settlement conference with the Magistrate Judge. The case did not settle, but "settlement negotiations continue[d]" for months. On July 27, 2022, the Magistrate Judge recognized that the "parties are unable" to "reach a mutually agreeable resolution." This opinion now follows.

## II. STANDARD OF REVIEW

The Act directs courts when reviewing a hearing officer's decision to: (1) receive records of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) grant appropriate relief based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C); *Hous. Ind. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000). A court must accord "due weight" to the hearing officer's findings, but it must also review the evidence and "reach an independent decision based on a preponderance of the evidence." *Id*. at 347 (quoting *Michael F.*, 118 F.3d at 252). For that reason, "when reviewing the decision of the [hearing officer] from the due process hearing, the district court's review is 'virtually de novo.'" *Woody*, 865 F.3d at 308-09 (quoting *Michael F.*, 118 F.3d at 252).

The Act creates a presumption in favor of the plan proposed by the school district, and places the burden of proof on the party challenging it. *Salley v. St. Tammany Par. Sch. Bd.*, 57 F.3d 458, 467 (5th Cir. 1995). And while the district court is required to give due weight to the hearing officer's findings, the court ultimately must arrive at its own independent decision based on the preponderance of the evidence. *Ruth B. ex rel. R.S. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319,

328 (5th Cir. 2020) (citing *Juan P.*, 582 F.3d at 583). "The Supreme Court has cautioned, however, that this standard is 'by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Ruth B.*, 951 F.3d at 330 (quoting *Rowley*, 458 U.S. at 206). "State and local authorities have primary responsibility for educating children and 'courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Renee J. I.*, 333 F. Supp. 3d at 683 (quoting *Rowley*, 458 U.S. at 207-08).

Here, because Reynolds challenges J.R.'s individualized education plan, she bears the burden to show that it is inappropriate. *See Salley*, 57 F.3d at 467.

### III. ANALYSIS

The District argues that it satisfied its legal obligations under the *Michael F.* factors. Reynolds does not apply the four-factor test, but instead argues that the District's decisions about J.R. denied him a FAPE for the 2016-17 and 2017-18 school years. Specifically, Reynolds asserts that J.R. was denied a FAPE when he was reduced from a full day of instruction to four hours per day and then from four hours per day to one hour per day. [12] at 10.

### A. The 2016-17 School Year

During the 2016-17 school year, J.R. was immersed in the general education population as much as possible but received his academic instruction in a self-contained classroom. [8-5] at 395. While his mother expressed some concerns about behavioral issues at home, J.R. did not exhibit those behaviors in the school setting. It was not until the next school year—2017-18—that the issues began.

### 1. Factor One: Individualized Program

The individualized education plan must be designed to meet the particular needs of the student based on the student's assessment and performance. It must include "sufficient support services to allow him to benefit from the instruction." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 810 (5th Cir. 2003). Reynolds argues that the 2016-17 plan was not properly written because Donna Dixon, the District's special education director, testified that the teacher who wrote J.R.'s plan needed more training in writing plans. Reynolds further argues that J.R.'s plan for the 2016-17 school year was not "reasonably calculated to enable JR to make progress." [12] at 19.

The Act requires that:

> [i]n developing each child's [individualized education plan], the [plan] team . . . shall consider (i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(d)(3). Additionally, the Act requires the plan to include a "statement of the child's present levels of academic achievement and functional performance, including how . . . the child's disability affects the child's involvement and progress in the general education curriculum . . . ." *Id.* at § 1414(d)(1)(A)(i)(I)(aa); 300 C.F.R. § 300.320(a)(1).

The plan for the 2016-17 school year noted that in reading, J.R, then a ten or eleven year old, "has been working through the First Grade Saxxon Phonics, and when given a sight word test from the kit, he was able to call all the words, except for the most recent ones introduced, which are still being worked on daily." [8-7] at 576. The plan acknowledged that his reading had improved, but that J.R. was still unable to "use phonics to decode words." *Id.* Thus, the plan for

the 2016-17 year set J.R.'s reading goal as "apply phonics and decode words and use words with 70% accuracy" in five out of ten trials "by the end of the school year." *Id*. The math goal set forth in the plan—to be able to find the perimeter of simple shapes during a math activity with 70% accuracy in three out of four attempts—was based on J.R.'s inability to find perimeters of simple shapes as revealed in school testing. *Id*. at 580.

In the area of gross/fine motor skills, J.R. "ha[d] difficulty with sizing on lines and spacing between words and sentences" when writing and "use[d] the hunt and peck method" when typing, both of which negatively affected him academically. *Id*. at 578. Thus, this annual goal was that ten to eleven year old J.R. would "demonstrate age appropriate handwriting/keyboard skills for the 3rd grade with 90% accuracy." *Id*. Finally, in the area of communication, the plan noted that J.R.'s lack of "expressive communication" impacted his participation socially with classroom peers. *Id*. at 582. J.R.'s communication goal was that, by the end of the school year, "when given a picture or read[ing] a story out loud" J.R. "would speak clearly in complete sentences in order to provide requested details." *Id*. The plan also identified the related services that J.R. required to allow him to benefit from educational instruction, including occupational therapy and speech therapy. Finally, the Committee recommended that J.R. ride the special transportation bus for the 2016-17 school year "due to [J.R.'s] lack of receptive and expressive communication skills, the inability to ride with his same aged peers on the regular bus, and the need for supervision in order to transition with ease." [8-7] at 633.

The record amply supports the hearing officer's findings that the 2016-17 plan was individualized "based on [J.R.'s] assessment and performance" and that it provided annual goals that related to each academic achievement and functional performance area. [8-4] at 334.

Reynolds' complaint that "the 2016-17 [plan] was not properly written" does not prove that the program was not individualized for J.R. [12] at 17. This allegation, even if true, challenges the academic benefit of the plan under the fourth factor, not the individual nature of the plan. *See E.R. v. Spring Branch Indep. Sch. Dist.*, Civ. Act. No. 4:16-cv-0058, 2017 WL 3017282, at *26 (S.D. Tex. June 15, 2017) (*E.R. II*) (stating that "Plaintiffs' complaints that the [plan] is not sufficiently detailed and the goals not measurable, even if true, do not prove this program was not individualized" for the student). This Court's job is to determine "whether the [plan] is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999. The preponderance of the evidence supports the hearing officer's conclusion that the plan was individualized to J.R.'s needs based on his assessment and performance.

### 2. Factor Two: Least Restrictive Environment

The second *Michael F.* factor requires that "[t]o the maximum extent appropriate, children with disabilities should not be removed from the regular education environment unless education in regular classes with the use of supplementary aids cannot be achieved satisfactorily." *Ruffin v. Hous. Indep. Sch. Dist.*, 459 F. App'x 358, 362 (5th Cir. 2012) (citations omitted). The Fifth Circuit has set out a two-part test for determining school compliance with this mandate: (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child;" and (2) if not, "whether the school has mainstreamed the child to the maximum extent appropriate." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). To aid in this fact-specific inquiry, the Court examines (1) the steps taken by a school to accommodate the disabled child in general education;(2) the extent to which the student receives

17

an educational benefit from general education; and (3) the effect the disabled student has on the general education population as well as any other pertinent factors. *Id*. at 1048-49.

Here, the evidence supports the hearing officer's finding that for the 2016-17 school year, the plan was administered in the least restrictive environment. Up until that school year, and the extensive re-evaluation, J.R. only went to a self-contained classroom for certain academic subjects. [8-5] at 395. But, at that time, it was determined that J.R. would benefit more from a self-contained classroom than a regular classroom. Additionally, the hearing officer both determined that supplementary aids used in the regular classroom would not help J.R. and noted that J.R. continued to go to recess and physical education with the regular class during the 2016-17 school year. Therefore, the preponderance of the evidence supports the hearing officer's findings that the 2016-17 plan was administered in the least restrictive environment possible. *See Spring Branch Indep. Sch. Dist.*, 2017 WL 3017282, at *27 (finding that plaintiff failed to satisfy her burden where student was removed from the general education class because she could not keep up with the work).

### 3. Factor Three: Coordinated and Collaborative Services

The third *Michael F.* factor requires a school district to administer a student's plan in a coordinated and collaborative manner that includes key stakeholders. *See R.H.*, 607 F.3d at 1012. As noted above, "[the Act] contemplates a collaborative process between the district and the parents." *Renee J. I.*, 333 F. Supp. 3d at 690 (quoting *Spring Branch Indep. Sch. Dist.*, 2017 WL 3017282, at *27). But "[t]he right to provide meaningful input is not the right to dictate the outcome." *Spring Branch Indep. Sch. Dist.*, 2017 WL 3017282, at *28 (citing *White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003)). The record shows that the District consistently included J.R.'s mother in the Committee meetings for J.R.'s plan over the 2016-17 school year. [8-

7] at 632 (parent present at the May 2017 meeting); [8-7] at 573 (parent present for March 2017 meeting). In addition to J.R.'s mother, there were many other "key stakeholders" who were routinely present at Committee meetings for J.R. Both the May 2016 meeting and the March 2017 meeting included an agency representative, a general education teacher, a special education teacher, and the District's speech pathologist. *Id.* The record amply supports the hearing officer's finding that the District included and collaborated with key stakeholders for J.R.'s plans.

### 4. Factor Four: Academic and Non-Academic Benefits

The Act guarantees an appropriate—not perfect—education, and the benefit conferred upon the student "must be meaningful" and "likely to produce progress." *Adam J.*, 328 F.3d at 808-09 (quoting *Michael F.*, 118 F.3d at 248). This final factor requires a student's plan to be reasonably calculated to result in "demonstrable academic and non-academic benefits." *Michael F.*, 118 F. 3d at 253. "The adequacy of a given [plan] turns on the unique circumstances of the child for whom it was created." *Endrew*, 137 S. Ct. at 1001. Again though, "[t]his absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 179).

Here, while Reynolds attacks the 2016-17 plan, she does not argue that J.R. made no progress. The hearing officer noted that J.R.'s special education teacher testified that J.R. made "sufficient progress in reading, occupational therapy, and math for the year, and had met his communication goal." [8-4] at 342. Based on these findings, the hearing officer found that the fourth *Michael F.* factor was satisfied.

19

As noted earlier, "[a]ny review of [a plan] must appreciate that the question is whether the [plan] is *reasonable*, not whether the court regards it as the ideal." *Endrew*, 137 S. Ct. at 999 (citing *Rowley*, 458 U.S. at 208-09). The ultimate goal is to provide the whole educational experience, adapted in a way to confer benefits on the child. *Hovem*, 690 F.3d at 397. Additionally, J.R. does not need to improve in every area to show that the plan conferred a benefit. *See Bobby R.*, 200 F.3d at 350.

This requires "courts to review each student's case in a fact-intensive, individualized, holistic manner." *Jennie W. ex rel. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 468 (5th Cir. 2022). "To make this judgment, [the court] must look to [J.R.'s] overall academic success, not whether [his] disability has been remedied." *Id.* (citing *Hovem*, 690 F.3d at 397-99). "The extent to which [J.R.] has progressed on [his plan] goals and objectives, as well as [his] test scores and percentile rankings, can aid this process, but no one factor can overwhelm it." *Id.*

J.R.'s teachers developed a plan which they believed would confer an educational benefit on J.R. for the 2016-17 school year. J.R.'s parents did not object to the plan at the time of the Committee meeting on May 4, 2016. Wilkins stated that J.R. did master some of his plan goals for the 2016-17 school year. [8-5] at 410. According to the academic achievement and functional performance sections, J.R. mastered certain annual goals in math and speech. [8-13] at 223, 225. Specifically, "[J.R.] [was] able to listen to the sounds in words and spell the word out as the teacher [said] the word slowly" and "[J.R.] [was] able to decode first grade site [sic] words with 70% accuracy with assistance." [8-7] at 601. And "[J.R.] . . . mastered finding the perimeter of a simple square with the use of a calculator with 80% accuracy." *Id.* Additionally, J.R. made notable progress

in the areas of reading and typing *Id*. at 219, 221. Finally, Wilkins testified that J.R. did not display any behavioral issues that year. [8-5] at 404-07.

While Reynolds asserts that the plan was not properly written, she does not argue that J.R. made no progress. The record reflects that J.R.—who has an I.Q. of 42—continued to struggle because of his disabilities. But J.R. exhibited no behavioral issues. It is undisputed that J.R. was unable to learn at grade level in any subject due to his disabilities. But the hearing officer found that the 2016-17 plan was designed to, and did, provide a FAPE to J.R. The preponderance of the evidence supports that finding.

## B. The 2017-18 School Year

With regard to the 2017-18 school year, Reynolds alleges that J.R. was denied a FAPE when, on October 25, 2017, his school day was reduced to one hour per day, four days per week and he was restricted to the assistant principal's office for all of his school time. Additionally, Reynolds asserts that during this time, J.R. did not receive any physical education. She argues that this was *per se* a denial of a FAPE. Conversely, the District argues that it has satisfied its legal obligations under the *Michael F.* factors.

### 1. Factor One: Individualized Program

As set forth above, the plan must be designed to meet the particular needs of the student based on the student's assessment and performance and include "sufficient support services to allow him to benefit from the instruction." *Adam J.*, 328 F.3d at 810. Reynolds again argues that the 2017-18 plan was not properly written. [12] at 21. She asserts that the District was not only required to provide J.R. specialized academic instruction, but also physical education. *See Marshall v. Georgetown Indep. Sch. Dist.*, Cause No. A-06-CA-127-LY, 2007 WL 9701220, at *9 (Aug. 29,

2007 W.D. Tex.) (concluding that school district was required to provide physical education to student that conformed with the requirements of a FAPE).

> Special education is defined under the Act as:
>
> Specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—
>
> > (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
> >
> > (B) instruction in physical education.

20 U.S.C. § 1401(29). Against this backdrop, the Court turns to the hearing officer's conclusion that the "goals and objectives of the 2017-18 [plan] took into consideration the Committee's extensive knowledge of [J.R.'s] abilities and needs and was individualized on the basis of the student's assessment and performance." [8-4] at 337.

A Committee meeting was held on May 8, 2017, to draft J.R.'s 2017-18 plan. [8-7] at 515. The plan included detailed notes of J.R.'s progress during the 2016-17 school year. The Committee also documented its consideration of J.R.'s assessments and performance, including the re-evaluation that had taken place earlier that year. [8-7] at 525. In math J.R. was "unable to identify two or fewer coins, count from 80-140 by 1's, count to 20 by 2's, correctly identify coin value or count money correctly . . . [or] identify factional parts." [8-7] at 525. The Committee also noted that J.R. was "unable to comprehend . . . what he has read without the prompting of pictures to help him recall certain passages." *Id*. And, in the area of life skills, the Committee stated that while J.R. could feed himself, but "he continue[d] to stuff food in his mouth until he chokes." *Id*.

Based on these and other findings, the Committee established numerous measurable annual goals. The math goals included: "to be able to identify all money and money value through

game based activities with 70% accuracy during 3 out of 4 attempts;" "when given digital and analog printed representations of clocks, [to] verbally tell and write the time in hours and half hours with 7/10 correct responses during telling time activities during 4 consecutive sessions;" use "manipulatives to understand numbers and representing quantities with corresponding numerals during 3 out of 4 attempts with 70% accuracy;" and "identify inches and feet by using a ruler or method of measurement to measure a line segment correctly using inches and feet during 3 out of 4 attempts during 3 consecutive sessions." [8-7] at 533, 539, 541, 543.

The plan also included several reading goals. One called for J.R. to "increase his comprehensive skills by asking and answering 'What,' 'Where,' 'Who,' 'When,' 'How,' and 'Why' questions on a first grade level text using picture prompts and begin to identify site words in print to connect words with meaning during 3 out of 4 attempts with 70% accuracy during reading activities." [8-7] at 545. Another called for J.R. to "identify the following second grade level site words: work, saw, first, made, pretty, want, present, under, both, never, some, and here and obtain knowledge of the word through realistic pictures in order to help understand word meaning with 7 out of 10 attempts during 4 consecutive sessions." *Id*. at 547. The plan included a third goal that J.R. "will read fluently and when given a sequence of events, place them in order by first, middle, and end during 3 out of 4 consecutive reading sessions." *Id*. at 549.

In response to the Committee's findings on J.R.'s eating issue, the plan included a goal for J.R. to use a vibrating toothbrush "in the morning and before lunch to help desensitize and increase [J.R.'s] oral motor skills." *Id*. at 537. Following the functional behavioral assessment in September 2017, a behavior component was added to J.R.'s plan in October 2017. *Id*. at 531.

23

Much of the record supports the hearing officer's findings that the 2017-18 plan "took into consideration the Committee's extensive knowledge of [J.R.'s] abilities and needs and was individualized on the basis of the student's assessment and performance." But then the plan was revised on October 25, 2017. [8-4] at 337. At that point, J.R.'s school hours were reduced, and he no longer went to physical education, recess, or lunch with his peers. Reynolds lone specific complaint about the 2017-18 plan is that J.R. was denied a FAPE when this happened.

While Reynolds also generally challenges the academic and non-academic benefits of the program, on this point she is undoubtedly correct. The plan revision on October 25, 2017, did not include a provision for J.R.'s physical education. Since physical education was undisputedly eliminated from J.R.'s plan on October 25, 2017, the Court finds that the preponderance of the evidence does not support the hearing officer's conclusion that the plan was individualized to J.R.'s needs based on his assessment and performance from that date forward.

**2. Factor Two: Least Restrictive Environment**

As stated above, the Court conducts a two-part test to determine if this factor is met: (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child;" and (2) if not, "whether the school has mainstreamed the child to the maximum extent appropriate." *Daniel R.R.,* 874 F.2d at 1048. To apply this test, the Court examines (1) the steps taken by a school to accommodate the disabled child in general education;(2) the extent to which the student receives an educational benefit from general education; and (3) the effect the disabled student has on the general education population and any other pertinent factors. *Id*. at 1048-49.

When the 2017-18 school year began, nothing had changed for J.R. in terms of the first two factors—the steps taken to accommodate J.R. in general education and the extent J.R. received educational benefit from general education. Like he did during the 2016-17 school year, J.R. continued to receive his academics in a self-contained classroom because he would not benefit from grade-level instruction, and he continued to have interactions with his regular education classmates outside of his academic periods. However, J.R.'s behavior significantly changed for the worse. In terms of the third factor, J.R.'s behaviors began to have a negative effect on the general education population. *Daniel R.R.*, 874 F.2d at 1048.

As the hearing officer stated, there was testimony from multiple witnesses that J.R. "regularly hit, kicked, and otherwise lashed out physically towards teachers, administrators, and fellow students," placing others in danger as well as himself. [8-4] at 338. For example, J.R.'s special education teacher documented repeated instances between September 21, 2017, and October 24, 2017, where J.R. slapped, charged, pushed, and kicked teachers, students, and administrators. [8-9] at 241-247.

Because of this aggressive and problematic behavior, on October 5, 2017, the Committee reduced J.R.'s school day to four hours per day. [8-7] at 516. This change was reflected in a revision to the plan which was signed (although signatures were not required) by the members of the Committee, including J.R.'s mother. The plan revision provided that "[a] [functional behavioral analysis] was conducted at the request of the teacher and a [behavioral intervention plan] will be put in place to help [J.R.] manage his behavior. A behavior goal was added to the [plan] and will be monitored by his teacher." *Id*. The revision contained the following handwritten note: "[J.R.] coming ½ day to school every day. [J.R.] will also see counselor two times a week." *Id*.

25

But, J.R.'s behaviors did not improve, instead the aggression intensified. On October 25, 2017, a review was conducted because of J.R.'s "aggressive and violent behavior toward teacher[s], students, and others." [8-13] at 281. Based on this review, a decision was made that J.R. would receive "homebound services where he will be coming to school 1 hour a day for 4 days a week." *Id.* at 284. Following this review, the Committee met again and revised J.R.'s plan as follows: "changed to reflect current placement. [Academic achievement and functional performance sections] [were] updated to reflect new deficit areas in behavior." [8-7] at 517. Of these four school hours per week, three hours were for academic instruction, one-half hour was dedicated to speech therapy and one-half hour was dedicated to occupational therapy. Additionally, J.R. was removed from the self-contained classroom and all instruction took place in the assistant principal's office. As the Court has already stated, the October 25, 2017, plan revision did not make any provision for J.R.'s physical education as was required by the Act.

As the hearing officer recognized, this revision incorrectly described J.R.'s services as "homebound," as that term "clearly envisions delivery of 'home' services in an actual home." [8-4] at 340. Further, the hearing officer noted that the revision amounted something akin to a "special class" at school, since instruction was not given in a more restrictive home/hospital environment. *Id.* at 340; *see Jefferson Parish Sch. Bd. v. Picard*, Civ. Act. No. 97-0507, 1998 WL 66105, at *3, n.19 (E.D. La. Feb. 3, 1998) (noting that placing a nonverbal student with autism in a homebound setting when other alternatives existed would deny him his right to be educated in the least restrictive environment).

Here, the evidence supports the hearing officer's finding that for the 2017-18 school year, the plan was administered in the least restrictive environment, at least before the revision to the

plan changing J.R.'s placement to four school hours per week was implemented. The Committee intended for the change in J.R.'s placement to four hours a week at school to be temporary while J.R.'s teachers worked on developing a positive relationship with J.R. "in order to remove those negative behaviors and maybe establish some positive behaviors." [8-4] at 339. Unfortunately, J.R.'s aggressive behaviors continued to impede his ability to do schoolwork as his teachers "were more focused on hitting than we were [on] completing academics." *Id.* at 339. There is certainly no evidence that returning J.R. to instruction in the self-contained classroom, much less to a general education classroom for academics or special subjects, would be beneficial to him and not disruptive to the classroom or safety of other students, teachers, and J.R.

As the Court discusses below in subsection III.B.4, after October 25, 2017, J.R.'s least restrictive environment changed from the school setting to a special school setting. He was increasingly combative with his teachers, to the point where they were constantly focused on redirecting his behavior instead of on academics. J.R.'s educational environment often consisted of him sitting in a chair for one hour a day, secluded from other children, still wearing his backpack, with little academic instruction, and the focus was on redirecting negative behaviors. [8-6], pp. 575-91. In sum, the preponderance of the evidence does not support the hearing officer's finding that the 2017-18 plan was administered in the least restrictive environment for the entire 2017-18 school year.

### 3. Factor Three: Coordinated and Collaborative Services

The third *Michael F.* factor requires a school district to administer a plan in a coordinated and collaborative manner. *See R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1012 (5th Cir. 2010). Similar to the 2016-17 plan, the record shows that the District consistently included J.R.'s mother

in the Committee meetings to devise and implement J.R.'s plans for the 2017-18 school year. [8-7] at 515 (parent present at the IEP meeting on May 8, 2017); [8-7] at 516 (parent present for plan revision meeting on October 5, 2017); [8-13] at 282, 284 (parent present and signed off on review); [8-7] at 517 (parent present at plan revision meeting on October 25, 2017). In addition to J.R.'s mother, there were many other "key stakeholders" who were routinely present at plan meetings for J.R. These included an agency representative, a general education teacher, a special education teacher, and the District's speech pathologist. *Id.* The record amply supports the hearing officer's finding that the District included and collaborated with key stakeholders in crafting and implementing J.R.'s plans.

### 4. Factor Four: Academic and Non-Academic Benefits

The final factor requires a plan to be reasonably calculated to result in "demonstrable academic and non-academic benefits." *Michael F.*, 118 F.3d at 253. Obtaining a "meaningful benefit" requires a school district to provide a "basic floor of opportunity that consists of access to specialized instruction and related services individually designed to provide [the student] with educational benefit." *Juan P.*, 582 F.3d at 590 (quoting *Rowley*, 458 U.S. at 201). This benefit must be more than *de minimis. Id.*

Here, Reynolds asserts that the October 25, 2017, amendment to the plan—reducing J.R.'s time at school to one hour per day, four days per week—was not appropriate and denied J.R. a FAPE. [12] at 13. She further alleges that J.R. was denied a FAPE because physical education—which is required by the Act—was eliminated from J.R.'s plan when his time at school was reduced to one hour per day. In fact, he was limited to one hour per day in an administrator's office. Some days he did not even remove his backpack. Much of the focus was on monitoring and redirecting

negative behaviors—not on academics. [8-6], p. 575-91. In fact, it appears the motivation was to focus on resolving the negative behaviors and, once accomplished, J.R. could be transitioned back to longer days for academic instruction. But this never happened.

The hearing officer found that the October 25, 2017, revision to the plan "eliminated physical education, required to be provided by § 300.308 from [J.R.'s] Curriculum." [8-4] at 342. Despite the undisputed fact that physical education was eliminated from J.R.'s plan, the hearing officer found that there was no denial of a FAPE. [8-4] at 347. The hearing officer further found that J.R. demonstrated positive academic and non-academic benefits during the 2017-18 year, even though his behavior did not improve.

### i. Non-Academic Benefits: Physical Education

As stated above, the District was required to provide physical education to J.R. that conformed to the requirements of a FAPE. *See Marshall*, 2007 WL 9701220, at *9 (concluding that school district was required to provide physical education to student that conformed with the requirements of a FAPE); 20 U.S.C. § 1401(29). It is undisputed that the October 25, 2017, revision to J.R.'s plan eliminated physical education. The District cites *Myles S. ex rel. SS v. Montgomery County Board of Education*, 824 F. Supp. 1549 (M.D. Ala. 1993), in support of its argument that it was not required under the Act to provide physical education where the child's physical needs are met in other ways. But in that case, the court considered a plan for a developmentally delayed *preschooler*. There the plan committee determined that separate physical education classes were not necessary or appropriate for a *preschooler* because his physical education needs were met through physical education within his classroom as well as physical and occupational therapy. *Myles S.*, 842 F. Supp. at 1555-56.

Unlike the *preschooler* in *Myles S.*, who attended his class for five hours every day at school, J.R.'s plan limited his time at school to one hour a day for four days a week. And of those four hours a week, three hours were set aside for academics or behavior monitoring, and occupational and speech therapies were allocated thirty minutes each. In essence, there was no physical education for J.R. who was now a teenager. There is no indication in J.R.'s plan that the Committee made any kind of determination or even discussed whether and what type of physical education was necessary for J.R. *See Myles S.*, 824 F. Supp. at 1556 (citing 34 C.F.R. § 300.307(c) ("[The Act] contemplates that the determination whether special education is necessary will be determined by the [plan].").

While the hearing officer correctly found that physical education was "required to be provided by § 300.308"and was eliminated from J.R.'s plan on October 25, 2017, [8-4] at 342, the hearing officer's conclusion that a "FAPE has [not] been denied" in the area of physical education is inconsistent with that finding. [8-4] at 347. Contrary to the hearing officer's cursory statement that Reynolds "put on no evidence during the course of the hearing" with regard to physical education, this Court finds ample evidence demonstrating that physical education was eliminated from the plan. J.R.'s primary teacher stated that there was no physical education program set forth in his plan and that "it was strictly academic at that point in time." [8-5] at 596. She admittedly did take J.R. outside to swing occasionally to give him "a little break in between academic skills." *Id.* But activities such as the occasional swinging or going to programs in the auditorium were not included in J.R.'s plan because the District was "focused on the academic skills. And there was only so much you could fit in the one hour." *Id.* at 596-97.

Finally, unlike the preschooler in *Myles S.*, who attended school five hours a day, J.R. attended school four hours a week. Of those four hours, thirty minutes were set aside for occupational therapy. The Committee did not address J.R.'s physical education in his plan, and as a result the District did not provide any physical education for J.R. This Court concludes that J.R. was denied a FAPE from the period of October 25, 2017,—when physical education was eliminated from J.R.'s curriculum—until the filing of the due process complaint. *See* 20 U.S.C. § 1401(29).

### ii. Academic Benefits

Reynolds also asserts that the plan amendment on October 25, 2017 denied J.R. a FAPE on academic grounds. She argues that the record supports her position that J.R.'s negative behaviors increased as his time at school decreased which impeded his ability to make meaningful educational progress while he was at school.

However, the hearing officer found that J.R. demonstrated "sufficient progress toward academic and behavior goals," according to the progress reports in J.R.'s 2017-18 plan. [8-4] at 342. Specifically, these reports stated that J.R. was using carrier phrases "when he became frustrated with 60% accuracy." [8-4] at 343; see [8-7] at 530. They also noted that J.R. was making progress in self-monitoring his impulsive behaviors, and that while he continued to attempt to hit, he "has not followed through with physical contact." *Id.* Additionally, the hearing officer found that J.R. was making sufficient progress in his math goals, as J.R. could identify the names of all coins with 80% accuracy, and could "tell time to [the] hour and half an hour with 80% accuracy." [8-4] at 343; see [8-7] at 534, 542. Finally, the hearing officer noted that the progress reports indicated that J.R. had made sufficient progress toward his reading goals even though J.R. continued "to struggle with his attention and completing reading activities." [8-4] at 343.

Specifically, these reports indicated that J.R. was able to "answer simple 'what' questions with picture prompts with 70% accuracy;" "made progress with using simple site words in sentences with 80% accuracy;" and had "done better with reading a short sentence and choosing the correct sequence with 70% accuracy." *Id.*; [8-7] at 546, 548, 550. Based on these findings, the hearing officer found that the fourth *Michael F.* factor was satisfied.

As stated above, instead of a plan-centric test for determining whether J.R. received meaningful academic and non-academic benefits, the Court must "review [J.R.'s] case in a fact-intensive, individualized, holistic manner." *Jennie W.*, 32 F.4th at 468. "To make this judgment, [the court] must look to [J.R.'s] overall academic success, not whether [his] disability has been remedied." *Id.* (citing *Hovem*, 690 F.3d at 397-99). "The extent to which [J.R.] has progressed on [his] [plan] goals and objectives, as well as [his] test scores and percentile rankings, can aid this process, but no one factor can overwhelm it." *Id.*

The District developed a plan, which it believed would confer an educational benefit on J.R. for the 2017-18 school year. The District evaluated and documented J.R.'s progress toward his plan goals quarterly. While the hearing officer noted that some progress had been made towards some of J.R.'s plan goals as of the 2017-18 year end progress report, many of the earlier progress report entries illustrate a much different picture of how J.R.'s negative behaviors impeded his academic progress.

For example, on January 9, 2018 this note was made concerning J.R.'s self-control goal: "[J.R.] is no longer able to compose himself when negative behavior arises. He continues to need redirection in order for him to keep his hands to himself." [8-7] at 530. And under that same goal on March 12, 2018, J.R.'s progress was described as: "[J.R.] is now receiving his services in the

32

administrators [sic] office due to him hitting others uncontrollably. He continues to need redirection in order for him to be successful with not hitting. He also needs two people in the same room at all times." *Id.* J.R. was also given a goal to use a vibrating toothbrush. His teacher made the following notes related to that: "[u]nable to attempt goal due to negative behaviors;" on January 1, 2018; "[u]nable to attempt goal due to negative behaviors" on March 12, 2018; and [u]nable to attempt goal due to negative behaviors at this time" on May 3, 2018. [8-7] at 538.

For math, the progress reports indicated that J.R. made progress with identifying the name of all coins with 80% accuracy. However, on January 9, 2018, an entry stated that "[t]his objective has been unsuccessful due to [J.R.'s] negative behaviors. [8-7] at 534. On March 12, 2018, J.R.'s instructor noted that his "negative behaviors impact positive learning at times," which impeded his ability to make progress on learning number quantities. *Id.* at 540. Finally, for his goal to learn the metric system these progress report notes were made: on January 9, 2018, "[J.R.] continues to have difficulties with the metric system. His negative behavior has limited progress;" on March 12, 2018, "[J.R.'s] negative behavior continues to distract his ability to learn the metric system at this time;" and on May 3, 2018, "[n]ot much progress has been made using the metric system at this time. [J.R.] does not understand the concept of measurement." *Id.* at 544.

J.R. had several goals for reading. For reading comprehension, the progress report showed that on March 12, 2018, "[J.R.] continues to show negative behaviors during his reading sessions." *Id.* at 546. With respect to increasing recognition of sight words, J.R.'s teacher noted: on January 9, 2018, "[J.R.] needs to continue to work on identifying the meaning of second grade site [sic] words. His behavior has impeded his academic progress at this time;" and on March 12, 2018, "[J.R.] is able to write simple sentences with second grade site [sic] words with prompting. His

negative behavior continues to impede his academic learning." *Id*. at 548. Finally, with regard to his reading sequency goal, J.R.'s teacher noted on March 12, 2018: "[J.R.] is able to identify first most of the time. He continues to struggle with second. [J.R.'s] behavior continues to impede his academic learning." *Id*. at 550.

During the hearing, the District admitted that it could no longer provide J.R. with a FAPE. The District's special education director testified that after the resolution meeting with J.R.'s parents on August 20, 2018, she believed the "school system was not capable of providing [a] FAPE." [8-5] at 345-46. J.R.'s special education teacher at George County Middle School also stated that it was his belief, as of September 21, 2018, that J.R. needed help outside of the District. [8-5] at 508. The Court finds that the record does not support the hearing officer's conclusion that sufficient academic and nonacademic benefits were demonstrated after J.R.'s 2017-18 plan was revised to limit his time at school to four hours per week. [8-6], pp. 575-91.

It is not the role of this Court to substitute its views for those of the District, but the Court finds that at some point after October 25, 2017, J.R.'s negative behaviors impeded his ability to progress academically, and the District was no longer providing a FAPE. The Court has already concluded that J.R. was denied a FAPE from October 25, 2017 until the filing of the due process complaint. Therefore, it is not necessary, nor is the Court able, to determine exactly when the District no longer provided a FAPE from an academic standpoint. *See Jennie W.*, 32 F.4th at 470 (stating that the Court's "review is narrow, limited to simply deciding whether school officials have complied with the [the Act]." (citing *White*, 343 F.3d at 377)). The preponderance of the evidence does not support the hearing officer's finding that the 2017-18 plan provided J.R. with a FAPE.

**C. Reynolds' Other Claims**

Reynolds further asserts that a FAPE was denied during the 2016-17 and 2017-18 school years due to a "denial of related services admitted by the [D]istrict to be appropriate." [12] at 31. Reynolds makes a number of conclusory statements and argues that a FAPE was denied because the District did not employ an autism expert or provide J.R. with applied behavior analysis therapy.

This Court has already addressed the use of supplemental aids and services in a self-contained classroom before J.R. was removed from a classroom setting with his peers in its discussion on the least restrictive environment. J.R. was engaging in aggressive and violent behaviors, posing a danger to other students as well as himself. And he continued to receive speech and occupational therapies, even after his school time was reduced to four hours a week.

Additionally, with regard to the specific requests made of the District by Reynolds, the District is not required to follow a particular educational methodology or conform to every wish of the parents. *See Rowley*, 458 U.S. 176; *Parrish v. Bentonville Sch. Dist.*, Civ. Act. No. 5:15-cv-05083, 2017 WL 1086198, at *9 (W.D. Ark. Mar. 22, 2017) (noting that "ensuring that a child obtains a FAPE does not mean providing a perfect education in conformity with every wish of the parents); *Daniel R.R.*, 874 F.2d at 1048 (holding that districts are not required to provide every conceivable supplementary aid or service to assist the child). While Reynolds firmly believes that the District should have provided J.R. with a number of specific services, she has not met her burden of proof in establishing that these services were necessary to provide a FAPE. Furthermore, since the Court's holding today finds that the District denied J.R. a FAPE after his time at school was reduced to four hours per week, on October 25, 2017, it is not necessary for the Court to reach the issue of whether these services would have provided a FAPE for J.R.

**D. Remedies**

At the November 4, 2021, hearing before this Court Reynolds conceded that she no longer desired any specific action by the District. Instead, the only remedy she seeks is attorneys fees. This request for costs and attorney's fees is made pursuant to 20 U.S.C. § 1415(e)(4)(B) and Federal Rule of Civil Procedure 54(d). Specifically, Reynolds requests costs and attorney's fees "for all counsel in the underlying due process proceeding and this proceeding." [12] at 31. A finding that a party is a prevailing party only makes that party *eligible* to receive attorney's fees; it does not automatically entitle that party to recover fees. *Douglas W.*, 158 F.3d at 209; *see* 20 U.S.C. § 1415(e)(4)(B).

Therefore, this Court may, in its discretion, award attorney's fees to Reynolds as a prevailing party. 20 U.S.C. § 1415(i)(3)(B)(i)(I); 34 C.F.R. § 300.517(a)(1)(i). However, since the Court found that a FAPE was provided prior to October 25, 2017, any award would be limited to the amount of costs and attorney's fees associated with presenting J.R.'s case on the denial of a FAPE from after that date. Prior to the Court's ruling as to whether an amount should be awarded—and, if so, how much—the parties are encouraged to reach an agreement regarding whether attorney's fees are appropriate and, if so, the amount of Reynolds' reasonable and necessary attorney's fees and costs.

## IV. CONCLUSION

For the reasons stated above, the decision of the independent hearing officer is AFFIRMED in part and VACATED in part. Reynolds is entitled to move for costs and attorney's fees associated with presenting J.R.'s case on the denial of FAPE from October 25, 2017, forward.

Counsel for both sides will meet and confer to reach an agreement on an amount of fees.

This Court has scheduled a telephonic status conference for October 24, 2022, at 1:30 p.m.

THIS, the 28th day of September, 2022.


_____
                    TAYLOR B. McNEEL
                    UNITED STATES DISTRICT JUDGE